**METTLER–TOLEDO, INC., Plaintiff**

v.

**Todd R. ACKER, d/b/a Precision Instrument Services, Defendant.**

No. 4:CV–95–1649.

United States District Court, M.D. Pennsylvania.

Nov. 21, 1995.

R. Jerome Richey, Sarah M. Bricknell, Buchanan Ingersoll Professional Corporation, Harrisburg, PA, for plaintiff.

Harry W. Reed, Lebanon, PA, for defendant.

## *MEMORANDUM*

McCLURE, District Judge.

### BACKGROUND:

Plaintiff Mettler–Toledo, Inc. initiated this diversity action against defendant Todd R. Acker, d/b/a Precision Instrument Services by way of a complaint filed September 28, 1995.

Plaintiff's complaint was accompanied by a motion for a preliminary injunction. A hearing on plaintiff's request for a preliminary injunction was held on October 25, 1995. Based on the findings of fact and conclusions of law which follow, we find that plaintiff is not entitled to the injunctive relief which it seeks.

### FINDINGS OF FACT

Four witnesses testified on plaintiff's behalf at the hearing: Alan H. Polackoff; William C. Comiski; Andrew Kovacs III and Charles V. Francis. Defendant testified on his own behalf, as did his wife.

Based on the testimony presented and the documentary evidence introduced at the hearing, the court makes the following findings of fact:

242

**THE PARTIES:**

1. Mettler–Toledo, Inc. (Mettler–Toledo or the company) is a Delaware corporation with its principal place of business in Worthington, Ohio.

2. Defendant Acker is an individual residing at RD 1, Box 644E, Shamanamtown Road, Annville, Pennsylvania 17003.

3. Mettler–Toledo is in the business of selling and servicing state-of-the-art technology precision balances, instruments and systems through the United States.

4. Mettler Instrument Corporation merged with Toledo, Inc. to form Mettler–Toledo on December 31, 1992.

5. Mettler–Toledo employs 3,200 employees and has annual gross sales of approximately $371,000,000.00. The bulk of its revenue is from sales. Mettler–Toledo services the equipment it sells only as a support to its sales business.

**METTLER–TOLEDO BUSINESS PRACTICES:**

6. Out of its facility in Hightstown, New Jersey, Mettler–Toledo employs approximately 80 service technicians based throughout the United States. Service technicians respond to customers' service needs, by performing, e.g., warranty and repair work, calibration and performance assurance.

7. Each service technician is assigned an exclusive geographic territory and each is responsible for servicing the Mettler–Toledo equipment in that territory.

8. Mettler–Toledo provides its service technicians with specialized tools, service software, service manuals, and a spare parts inventory.

9. Mettler–Toledo's service technicians and its salesmen are its primary interface between it and its customers.

10. Mettler–Toledo invests time and resources in training and certifying its service technicians.

11. Mettler–Toledo invests time and resources in marketing its products and services and in compiling useful information on the service needs of its customers, including such information as the names of contact-persons, researchers or end-users within the company, the customer's service plans and needs, when its last annual service was performed, or should be, performed and the fee charged.

12. Such information is derived from warranty cards filled out and returned by its customers. Customers are given incentives including a free service visit and calibration for returning a completed warranty card. The warranty cards contain such information as the model, serial number, customer name and address. Such information is valuable to Mettler–Toledo in its marketing efforts. When the service technician calls to provide the free service and calibration for returning the warranty card, he has an opportunity to solicit continuing business from the customer.

13. This information is updated daily and communicated to Mettler–Toledo service technicians to help them successfully market the company's services.

14. A typical · Mettler–Toledo customer has its equipment serviced once a year. Knowing when annual service calls fall due gives Mettler–Toledo is an important competitive advantage.

15. A typical Mettler–Toledo customer has a number of departments, each of which will is typically autonomous in terms of selecting a precision instrument service technician, and each of which typically has a different contact person responsible for arranging for such service.

16. Pennsylvania State University is an example of a typical customer. Within the university, there are numerous departments, each of which are dealt with on an individual basis. Some departments are further broken down into different laboratories used by many different researchers. Generally, the researcher, the end-user of the balance, selects the service company. In the course of his employment with Mettler–Toledo, Acker was provided with the names and telephone numbers of all of its end-users in the Harrisburg territory.

## ACKER'S EMPLOYMENT AS A SERVICE TECHNICIAN

17. Acker was hired by Mettler Instrument Corporation, predecessor to defendant Mettler–Toledo, on October 16, 1987 to work as a field service representative in the Harrisburg, Pennsylvania area. His title was later changed to service technician. He remained employed with the company until his resignation on September 6, 1995.

18. Acker signed and submitted an employment application containing the following:

I further understand that any knowledge whatsoever of a confidential nature which I may acquire as a result of or in connection with my employment shall remain the sole and exclusive property of Mettler Instrument Corporation both during and after termination of my employment.

19. Acker was assigned to the Harrisburg, Pennsylvania territory and used the information and resources which it made available to him to expand its customer base in that region during the seven years he was with the company.

20. In 1994, Mettler–Toledo's total annual service revenue from customers serviced by Acker was approximately $120,000.00.

21. Acker earned approximately $35,000.00 from Mettler–Toledo during 1994, his last full year of employment. In addition to his salary, he received fringe benefits consisting of medical, dental, prescription, short term disability and long term disability insurance, pension benefits and 401K contributions.

22. Mettler–Toledo also provided Acker with a company car, provided insurance and maintenance for the car and reimbursed him for all allowable business expenses.

23. Before he was hired by Mettler–Toledo, Acker had no previous experience in the precision-instrument servicing industry and had no business relationships with any Mettler–Toledo customers.

24. Acker received approximately 13 weeks of training in servicing Mettler–Toledo products when he began working for the company in 1987. He was trained in the field and introduced to Mettler–Toledo customers by a company service trainer. Acker also received in-house training at Mettler–Toledo's Hightstown facility.

25. Following his initial training period, Acker could draw upon the experience of more-senior service technicians and seek information from them to learn the servicing business. It takes some time for new-hires to completely learn the business. He also periodically received follow-up training.

26. All training was done at Mettler–Toledo's expense.

27. Through Acker, Mettler–Toledo serviced 35% of all Mettler–Toledo balances installed in the Harrisburg territory.

## ACKER'S RESIGNATION

28. In August, 1995, Acker was offered a job by American Weigh Systems (American Weigh) as a service technician in its analytical division. American Weigh is in the business of servicing large industrial balances and is not in direct competition with Mettler–Toledo in the analytical field.

29. Acker verbally informed his supervisor at Mettler–Toledo of the offer from American Weigh.

30. Acker did not accept American Weigh's offer, because he did not want to sign the three-year non-compete agreement it demanded as a condition of employment.

31. At or around the time when he declined American Weigh's offer, he decided to start his own business servicing precision instruments and began exploring that option and laying some of the groundwork by applying for a business loan.

32. Acker informed Mettler–Toledo orally on September 6, 1995 that he was resigning and submitted a letter of resignation the following day. He also informed the company on September 6th that he was starting his own business servicing precision equipment.

## PRECISION INSTRUMENT SERVICES

33. Acker went into business for himself as Precision Instrument Services (PIS) repairing and maintaining precision instruments. PIS competes with Mettler–Toledo

for service customers in the Harrisburg, Pennsylvania—Acker's former territory.

34. Acker began operating PIS out of his home on October 2, 1995 and is its sole employee. PIS sells and services precision instruments, systems and balances.

35. Acker has acquired the right from Sartorious, Inc., a manufacturer of precision instruments, systems and balances to sell and service their equipment.

36. Acker borrowed $30,000.00 secured by a second mortgage on his house to start the business. He borrowed additional funds to purchase computer equipment, a business vehicle and the necessary servicing tools, supplies and inventory.

37. He will order the supplies needed for his work from Mettler–Toledo, Sartorious and other manufacturers.

## CUSTOMER INFORMATION

38. Immediately after he resigned, on the day when he returned his company car, Acker also returned to Mettler–Toledo all documents, microfiche films, software manuals, tools and all other materials and supplies provided to him by the company. He retained nothing in the way of documents, stored data, etc. belonging to the company.

39. Much of the customer information which Mettler–Toledo supplied to Acker was stored on microfiche—and could be accessed only with a reader for the same. Mettler–Toledo supplied Acker with the reader and he returned it to the company when he left its employ.

40. Typically, only universities, hospitals, municipal water and sewage treatment facilities and research laboratories use the type of equipment sold by Mettler–Toledo.

41. Due to the specialized nature of the work, there are only a finite number of organizations in the Harrisburg area who are potential users of Mettler–Toledo or PIS' services. Persons in the business would tend to know, or could readily ascertain, what entities those are, and contact them to solicit their business. Other information helpful in soliciting such business, such as the names of contact persons, service plans and schedules, can readily be obtained from the potential customer itself and used to promote or solicit further business with the company.

42. Relying only on his memory of his contacts, service visits, customer contact persons, etc. from the period he was with the company, and sources available to the public generally, such as telephone directories, Acker had enough information to contact and solicit business from potential customers.

43. Acker draws on his knowledge of Mettler–Toledo's customer base and its service schedules and contacts individuals he recalls dealing with while employed by Mettler–Toledo in marketing the services of PIS. Assisted by his wife, he combs telephone directories, hospital and university directories, and old business cards for the names of potential customers to contact. He also uses "cold" calling techniques and mass mailings to solicit business for PIS.

44. Acker draws on the skills and knowledge he acquired while employed by Mettler–Toledo to perform maintenance work through PIS.

45. Acker did not solicit any customer of Mettler–Toledo while he was in its employ. The decision to start his own business was made just prior to his resignation from Mettler–Toledo, he had been entertaining an offer from American Weigh, and only decided to establish his own business when he found that the could not accept American Weigh's offer on its terms.

46. Acker did not induce any former customer of Mettler–Toledo to break its contract with that company.

47. Acker fairly competes with his former employer by notifying potential customers that he is now operating his own servicing company in the hopes of obtaining their business when their service contract is up for renewal. He hopes to obtain customers for PIS based on service and price competition.

48. Since Acker's resignation, approximately ten former Mettler–Toledo customers scheduled to have their annual service performed by it have elected to have their equipment serviced by PIS instead.

## MITIGATION AND CALCULATION OF DAMAGES

49. Compared to Mettler–Toledo's total annual revenues from all sources, the potential loss it would sustain even if a significant number of Harrisburg-area service customers were lost to Mettler–Toledo is insubstantial in relation to its total annual revenues from sales and service nationwide.

50. Mettler–Toledo can and has taken steps to mitigate its losses by lowering its prices and increasing its service presence in the Harrisburg territory to compete more successfully against PIS.

51. PIS is not Mettler–Toledo's only competitor in the Harrisburg area.

52. Acker was Mettler–Toledo's only service representative in the Harrisburg territory—the area now also serviced by PIS. Any revenues lost through competition with PIS would be readily calculable to a reasonable degree of accuracy by comparing Mettler–Toledo's total service revenues for the Harrisburg before and after the start-up of PIS.

53. The customers of each business are readily quantifiable. Mettler–Toledo had a customer base of approximately 768 customers in its Harrisburg territory.

54. PIS had 36 customers at the time of the hearing. The names of customers who switch from Mettler–Toledo to PIS can readily be determined.

## COMP TIME

55. During his last full month of employment with Mettler–Toledo, Acker misrepresented the hours worked per week on his reports to the company. He did this because he had already used all of his vacation and sick leave for the year and needed additional days off to interview for a job with another company and because he wanted to use the company's policy of awarding compensatory time or "comp time" so that he could take additional days off in August, 1995. He intended to make up the time by working overtime in September, a month when many annual service calls of his customers fall due.

56. Mettler–Toledo has a policy of giving employees comp time if they work more than forty hours a week so that they are not required to compensate employees for overtime.

57. Company policy, however, did not allow employees to take comp time before it had been earned. In doing so, Acker violated company policy. The fact that he had been told by co-workers that this was an acceptable practice did not legitimize it.

## SEPTEMBER BACKLOG

58. Acker did not intentionally create a back-log of customers requiring service prior to resigning so that he could then take advantage of the same to increase revenues for PIS. The backlog resulted from desire to take days off in August and make up the time later in September by working extra hours that month.

59. That plan went awry when Mettler–Toledo refused his offer to work another two weeks after he submitted his resignation. Acker was concerned about the hold billings he had issued to justify the comp time taken in advance in August, 1995, and spoke with Mettler–Toledo's service coordinator to see what could be done about the matter. However, Acker could not remedy the situation, because Mettler–Toledo would not permit him to work the two weeks after he submitted his resignation as he had planned to do.

### Standards for relief

■ As the party seeking injunctive relief, the plaintiff bears the burden of proof. In deciding whether an injunction should issue, the court "must carefully weigh four factors:" 1) whether the movant has demonstrated a reasonable probability of success on the merits; 2) whether the movant will suffer irreparable injury if the injunction does not issue; 3) whether granting the injunction will result in "even greater harm to the nonmoving party;" and 4) whether granting the injunction serves the public interest. *Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994).

■ Irreparable harm and likelihood of success on the merits are essential elements. Absent a showing of either one, the petitioner is not entitled to injunctive relief. To prove irreparable harm, the petitioner must show that the harm threatened by the defendant's conduct, cannot be compensated by

money damages. If the threatened harm is compensable with monetary damages, the petitioner has not demonstrated irreparable harm and is not entitled to a preliminary injunction. *Frank's GMC Truck Center, Inc. v. G.M.C.*, 847 F.2d 100, 102–03 (3d Cir.1988) and *Morton v. Beyer*, 822 F.2d 364, 371–72 (3d Cir.1987).

### Likelihood of success on the merits

To establish a likelihood of success on the merits, plaintiff must demonstrate a likelihood that it can show a protectible trade secret or right of confidentiality in the customer information which its seeks to prevent Acker from using.

All parties agree that Pennsylvania law governs.[1] In *SI Handling Systems v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985), the United States Court of Appeals for the Third Circuit applied Pennsylvania law in considering an interlocutory appeal of the district court's issuance of a preliminary injunction barring the use and disclosure of trade secrets. To establish a right to injunctive relief barring the disclosure of allegedly confidential information under Pennsylvania law, the court held, the moving party must demonstrate:

1) that the information constitutes a trade secret;
2) that it is of value to the moving party and important in its business;
3) that by reason of discovery or ownership the moving party has a right to the use and enjoyment of the secret; and
4) that the secret was communicated to the non-moving party while employed in a position of trust and confidence under such circumstances as would render it inequitable and unjust for that party to disclose the information to others, or to make use of it himself, to the prejudice of the moving party.

*Id.* at 1255. The court looked to the Pennsylvania courts' adoption of *Restatement of Torts*, § 757 comment b (1939) for a definition of a "trade secret:"

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*Id.* at 1255 (Emphasis supplied.) See also: *Project Development Group, Inc. v. O.H. Materials Corp.*, 766 F.Supp. 1348, 1355 (W.D.Pa.1991), *aff'd without op.*, 993 F.2d 225 (3d Cir.1993).

The Third Circuit culled from *Restatement of Torts*, § 757 comment b, six factors "to be considered in determining whether given information is a trade secret:"

1) the extent to which the information is known outside of the owner's business;

2) the extent to which it is known by employees and others involved in the owner's business;

3) the extent of measures taken by the owner to guard the secrecy of the information;

4) the value of the information to the owner and to his competitors;

5) the amount of effort or money expended by the owner in developing the information; and

6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* at 1256, citing *Restatement of Torts*, § 757 comment b (1939); and *International Election Systems Corp. v. Shoup*, 452 F.Supp. 684, 706 (E.D.Pa.1978), *aff'd*, 595 F.2d 1212 (3d Cir.1979).

 Customer lists receive protection as trade secrets, *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 842–43 (1957), only if they cannot be "easily or readily obtained" from an independent source. *National Risk Management, Inc. v.*

---

**1.** There is no basis for applying the law of any other jurisdiction. Defendant was hired in Pennsylvania and worked here exclusively during his years with the company. He continues to reside here and owns and operates PIS here. No other jurisdiction has any contacts with the events giving rise to this dispute.

*Bramwell,* 819 F.Supp. 417, 431 (E.D.Pa. 1993). The courts will not grant protection to customer lists which are readily and easily generated from trade journals, telephone book listings, or other sources of information available generally. *Bell Fuel Corp. v. Cattolico,* 375 Pa.Super. 238, 544 A.2d 450, 461 (1988) (collecting cases).

■ To prevail on a claim of confidentiality, the moving party must also demonstrate that reasonable precautions under the circumstances were taken to prevent unauthorized disclosure to third parties, and that such individuals could access the material without difficulty only by resort to unlawful methods. *Id.*

"The owner of a trade secret, unlike the owner of a patent, does not have a monopoly over the process or formula. He is only protected from other persons' gaining access to it either by stealing it directly from him, or having another to whom it was lawfully disclosed do so." *National Risk,* 819 F.Supp. 417, 431.

■ Others in the business are free to compile the same information so long as they obtain their knowledge through their own independent efforts and not merely "borrowing" the information from their competitor. Adapted from *National Risk,* 819 F.Supp. at 431, citing *Continental Data Systems, Inc. v. Exxon Corp.,* 638 F.Supp. 432, 442 (E.D.Pa. 1986) and quoting *Greenberg v. Croydon Plastics,* 378 F.Supp. 806, 812 (E.D.Pa.1974).

■ The fact that individual pieces of the information claimed to be confidential are available to the general public does not defeat a claim of confidentiality if the value of the information stems from its compilation or collection in a single place or in a particular form which is of value. *National Risk,* 819 F.Supp. at 432.

■ When disclosures of a confidential nature are made to an employee or an independent contractor, all trade secrets created out of that relationship are the exclusive property of the employer or the contracting party. *Computer Associates International, Inc. v. American Fundware, Inc.* 831 F.Supp. 1516, 1524 (D.Colo.1993); quoting 2 Melvin F. Jager Trade Secrets Law § 8.01[1] at 8–3.

**Plaintiff's case**

■ Here, the evidence before us establishes the following: Acker retained no files, customer lists, data bases, microfiche films or other stored data belonging to Mettler–Toledo. All that he took with him is the accumulated knowledge obtained over his seven year period with the company.

Mettler–Toledo has no protectible interest in the customer information at issue. A good deal of the information can be obtained from sources available to the public generally, such as telephone directories, university and hospital directories. The remainder can be readily obtained by contacting the entities listed in such directories and making inquiries as to who should be contacted about servicing the precision equipment, when services fall due, etc. All of this can be accomplished with relative ease and some perseverance by Acker or any one else familiar enough with the industry to know what types of businesses or agencies use precision equipment.

This court's decision earlier this year in *Appleby v. Caradon Thermal–Gard,* (M.D.Pa.1995) illustrates the distinction between what is protectible as a trade secret and what is not. In that case, Appleby's manner of doing business generated a unique list of customers which identified individual homeowners who had purchased one or more replacement windows from Appleby and were, therefore, likely to be in the market for additional replacement windows within the next few years. Aside from the labor intensive manner in which Appleby compiled its list, there is no way to readily obtain this information by researching public records, etc. Any one wanting such a list would have to go through the same process Appleby did by contacting on an individual basis each and every homeowner in a certain locality to see if he or she were interested in purchasing replacement windows, had recently replaced some, but not all of the windows in his house, etc. The effort that went into compiling the list and its uniqueness and the inability of others in the industry to readily or inexpen-

sively compile the same list made it protectible as a trade secret. Mettler–Toledo's list, on the other hand, has none of these qualities.

Here, Acker did not retain any physical property of Mettler–Toledo; it was all returned to Mettler–Toledo immediately upon termination of his employment. This included all documents, whether in the form of microfiche, hard copy or otherwise, which contained information pertaining to Mettler–Toledo's customers. Nor did he utilize those documents in compiling his new customer lists. Pieces of information concerning customers which an employee may recall from years of dealing with and helping to compile the same, or comparable data which he is able to compile on his own based on the experience and knowledge acquired through years of working in the business, are not protected as confidential trade secrets.

It is also for these reasons that the clause set forth in Acker's employment application barring his use of confidential information does not come into play. The application provided that:

> I further understand that any knowledge whatsoever of a confidential nature which I may acquire as a result of or in connection with my employment shall remain the sole and exclusive property of Mettler Instrument Corporation both during and after termination of my employment.

Having found that the information at issue is not a confidential trade secret, the "confidentiality clause" quoted above does not apply.

Granting Mettler–Toledo the relief which it seeks would give it the functional equivalent of a non-compete agreement. He would be barred from competing for any customers which he serviced during his seven-year employment with Mettler–Toledo. Because the market for his services is finite—only certain entities use the type of equipment he services, e.g. hospitals, universities, municipal sewage services, he would be effectively shut out of the market. His only option would be to attempt to establish his area outside the boundaries of his former territory.

Mettler–Toledo has no basis for obtaining such relief. Acker did not sign a non-compete agreement. There is, therefore, nothing which legally bars him from competing directly against it in his former territory and it would be improper for this court to bring about that result. He is entitled to use all of the skills, knowledge, and business acumen he acquired over the years he was employed by Mettler–Toledo. So long as he uses no trade secrets or confidential information of the company, he is free to compete aggressively against it.

Plaintiff has not persuaded this court that it has a protectible trade secret or right of confidentiality in the customer information which its seeks to prevent Acker from using and has not, therefore, established a likelihood that it will succeed on the merits.

### Plaintiff's showing of irreparable harm

■ We also remain unpersuaded that plaintiff will suffer irreparable harm, i.e. harm not compensable in monetary damages if the injunction is not granted. What is at stake is the possibility that customers will shift their business from Mettler–Toledo to PIS during the pendency of this action. If that occurs and if plaintiff prevails on the liability issues at trial, damages can be readily ascertained by reviewing the customer lists and receivables of both for the Harrisburg area and determining which customers shifted their business from Mettler–Toledo to PIS during the interim period.

### Maintenance of the status quo

Denying the injunction will preserve the status quo. Acker has been operating his competing business for nearly two months. Granting the injunction now would effectively require him to cease soliciting or doing business with any of his former customers in the Harrisburg territory and to cancel service contracts with the 36 customers PIS has acquired.

### Balancing of the equities

■ A balancing of the equities clearly supports denial of the requested injunction. Mettler–Toledo appears to have no protectible interest in the information which it seeks to preclude Acker from using or compiling on

his own. Issuing the injunction would require, in effect, the immediate cessation of most business by PIS. Acker would have to cancel existing service contacts with any former Mettler–Toledo customer. Acker depends upon the income from his fledgling business to support his wife and child and has no other outside employment at this time. He has incurred substantial debt in establishing the business and acquiring tools, office equipment, etc. All that he has invested would be at risk if the injunction issues.

Conversely, Mettler–Toledo will not be placed in any peril if the injunction does not issue. Its sales revenues from the Harrisburg territory are an insignificant percentage of its total revenue and it will, in all likelihood, be deprived of only an insubstantial portion of that revenue during the pendency of this action. During the two months of its existence, Acker has persuaded only ten customers out of an approximate 760 Mettler–Toledo customers in the Harrisburg territory to choose PIS over Mettler–Toledo. The loss of revenue from some service customers in the territory will not cause Mettler–Toledo any financial or other harm which cannot be fully compensated for at a later date.

For all of these reasons, we decline to issue the injunction.

## CONCLUSIONS OF LAW

1. Federal jurisdiction exists on the basis of diversity of citizenship. 28 U.S.C. § 1332.

2. Mettler–Toledo has no protectible property interest in the customer information it seeks to preclude Acker or PIS from compiling or utilizing to compete against it.

3. Such information is not protectible as a trade secret under Pennsylvania law.

4. Mettler–Toledo will not suffer irreparable harm if the injunction does not issue.

5. Any harm or losses which plaintiff may suffer if Acker is allowed to remain in competition against it are fully compensable in money damages. Any revenue lost to Acker or PIS can be readily calculated.

6. Issuing the injunction would have a significant detrimental impact on the defendant.

7. Denying the injunction will have only a minimal impact on the overall operations and profitability of Mettler–Toledo.

8. Denying the injunction will maintain the status quo.

9. Plaintiff had no non-compete agreement with defendant and is not entitled to the functional equivalent of the same under the guise of a preliminary injunction.