**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**

v.

**Thomas M. STELLA.**

**Civil Action No. 97–4163.**

United States District Court,
E.D. Pennsylvania.

Feb. 10, 1998.

Nathaniel H. Akerman, Seyfarth, Shaw, Fairweather & Geraldson, New York City, Sara A. Begley, Reed, Smith, Shaw & McClay, L.L.P., Philadelphia, PA, for Plaintiff.

Michael G. Trachtman, Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C., King of Prussia, PA, for Defendant.

## DECISION

JOYNER, District Judge.

This case has been brought before the Court by motion of the plaintiff, Prudential Insurance Company for the issuance of a preliminary injunction against Thomas M. Stella, a former Prudential sales agent. Following a hearing on September 2, 1997 and the parties' submissions of briefs and proposed factual findings and legal conclusions, we now make the following:

## FINDINGS OF FACT

1. Plaintiff Prudential Insurance Company of America is a corporation organized under the laws of the State of New Jersey with its principal place of business in Newark, New Jersey. Plaintiff has offices in Langhorne, Pennsylvania and is in the business of selling life insurance, annuities, mutual funds, and property and casualty insurance, among other products. (Pl's Complaint and Def's Answer thereto, at ¶ 1).

2. Defendant Thomas M. Stella is an adult individual residing in Pipersville, Pennsylvania. (Pl's Complaint and Def's Answer thereto, at ¶ 2).

3. Thomas Stella began working as a sales representative and agent for Prudential on April 30, 1990 out of Prudential's Pennypack District offices primarily on Castor Avenue in Northeast Philadelphia and in Langhorne, Pennsylvania. Prior to his employment with Prudential, Stella had not had any experience in the insurance industry or in servicing insurance customers. (N.T. 4–5, 14, 18, 63–65, 112–113, 206, 210, 216, 235–236; Exhibit P–1).

4. As a Prudential sales agent, Stella sold and serviced Prudential property, casualty and life insurance. (N.T. 5).

5. Although Prudential's internal procedures dictated that new sales agents execute and return an "Agent's Agreement" by the date that they begin work for an assigned agency, Stella was not presented with and did not sign an Agent's Agreement until May 22, 1990, nearly one month after he commenced his employment with Prudential. Subsequent to his execution of the Agent's Agreement, plaintiff's rate of compensation remained the same and there were no changes in any of the terms and conditions of Defendant's employment with Plaintiff until September, 1991. (N.T. 89, 103–108, 114–116, 210–212; Exhibits P–1, D–1).

6. The Agent's Agreement which Defendant Stella signed on May 22, 1990 identifies his appointment "as an Agent of the Prudential Insurance Company of America" as the consideration for the agreement. Additional consideration in support of the agreement exists by virtue of the individual agent's pay and employee benefits provided pursuant to Article Four of the Collective Bargaining Agreement between Prudential and the United Food and Commercial Workers International Union (AFL–CIO & CLC). (N.T. 87, 97–98; P–1, P–2, P–3, P–4, P–5).

7. Prior to May 22, 1990 when he signed it, Defendant had neither seen the Agent's Agreement, nor had he discussed it with anyone. (N.T. 211).

8. The United Food & Commercial Workers International Union (AFL–CIO & CLC) is the exclusive representative for purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment of all Prudential district agents in the Commonwealth of Pennsylvania, among other states. At the time Stella became employed as an agent with Prudential, the collective bargaining agreement dated September 25, 1989 was in full force and effect. (N.T. 85, 92, 95–96; Article I, Exhibits P–2 through P–5).

9. Although Defendant had no knowledge that the collective bargaining agreement existed and had no knowledge that there was a union until six months after he was hired by Prudential, he thereafter became a union member and accepted the benefits of and became subject to the collective bargaining agreement(s), as amended from time to time. (N.T. 92–101, 105–109, 116–120, 212–214; Exhibit P–117).

10. The collective bargaining agreement was re-negotiated on September 30, 1991,

September 27, 1993 and September 25, 1995. Each agreement was effective for approximately two years each. (P–2, P–3, P–4 and P–5).

11. The Agent's Agreement which Stella executed on May 22, 1990 is an employment contract with Prudential. (N.T. 87).

12. Section 6 of the Agent's Agreement executed by Stella on May 22, 1990 provides, in pertinent part:

(b) That all books, records, documents and supplies, and all contractholder or product information of any kind whether furnished by the Company or obtained or prepared by me while employed by the Company shall be deemed exclusively Company property; and upon termination of this Agreement by either party, I will promptly deliver all such property, including all copies thereof to a proper representative of the Company.

(c) That all information which either identifies or concerns contractholders of the Company or its subsidiaries, including, but not limited to, contract values and beneficiary information is confidential and of special value to the Company; and therefore, I shall not provide to any person not in the Company's employ any information which may be used to solicit for sales on behalf of some other company or organization.

(N.T. 3–4; Exhibit P–1).

13. In addition, Section 14 of the Agent's Agreement states:

That for a period of two years from the termination date of this Agreement, I shall not directly or indirectly:

(1) Solicit, cause or induce any contractholder of the Company or its subsidiaries who became known to me during my employment with the Company to purchase services or products which compete, directly or indirectly, with those sold by the Company or its subsidiaries.

(2) Do anything to cause, persuade or encourage anyone to reduce, discontinue, or terminate any Company or subsidiary policy, contract, service, or product of any kind.

(3) Do anything to cause, persuade or encourage any Company or subsidiary employee to either:

a. terminate his/her employment with the Company for any reason; or

b. sell or solicit services or products on behalf of any other company which are in any way similar to those sold by the company or its subsidiaries.

(N.T. 3–4; Exhibit P–1).

14. Under the "Effect of Agreement" Article of the collective bargaining agreements, individual agent's agreements remain in full force and effect and are modified by the collective bargaining agreements only insofar as any of the agent's agreements' terms are specifically superseded or modified by the collective bargaining agreement(s). (N.T. 92–99; Exhibits P–2, P–3, P–4, P–5).

15. The language contained in Sections 6 and 14 of the Agent's Agreement which Defendant executed on May 22, 1990 was modified slightly in the collective bargaining agreements of September 25, 1989, September 30, 1991, September 27, 1993 and September 25, 1995. Those collective bargaining agreements, however, reflected changes to the foregoing provisions of the agent's agreements and stated, in relevant part:

"...Section 7 of the Agent's Agreement (all editions prior to 1984) is hereby modified to read as follows:

7.(a) That upon termination of this Agreement either by myself or the Company, or at any other time upon request by the Company, I will immediately submit said books and records for an inspection and accounting, to be made in accordance with the rules of the Company then in force.

(b) That all books, records, documents, software, supplies and contractholder or production information of any kind, whether furnished to the Prudential Representative by the Company or obtained or prepared by the Prudential Representative while employed by the Company, shall be deemed exclusively Company property; and upon termination of my Agreement by either party, the Prudential Representative will promptly deliver all such property,

including all copies thereof to a proper representative of the Company......"

(c) That all information entrusted to the Prudential Representative which either identifies or concerns contractholders of the Company or its subsidiaries including, but not limited to contract values and beneficiary information is confidential and is of special value to the Company; and, therefore, the Prudential Representative shall not provide to any person not in the Company's employ any information which may be used to solicit for sales on behalf of some other company or organization.

"...Section 13 of the Agent's Agreement is hereby modified as follows:

13. (a) That the appointment as Prudential Representative and this Agreement may be terminated either by the Prudential Representative or the Company at any time.

(b) That for a period of two years from the termination date of this Agreement, the Prudential Representative shall not directly or indirectly:

1. Do anything to cause, persuade or encourage anyone to reduce, discontinue or terminate any Company or subsidiary policy, contract, service, or product of any kind.

2. Do anything to cause, persuade or encourage any Company or subsidiary employee to either:

(a) terminate his or her employment with the Company for any reason; or

(b) sell or solicit services or products on behalf of any other company which are in any way similar to those sold by the Company or its subsidiaries.

(N.T. 93–94; Exhibits P–2, P–3, P–4, P–5).

16. Thomas Stella resigned his position with Prudential, effective August 16, 1996, after having given two weeks notice of his intention to do so and began working for the Intieri Agency selling Allstate Insurance products on September 1, 1996. (N.T. 6, 11, 16, 25–27, 126).

17. When Defendant was employed with Prudential, he sold an average of 200 to 250 insurance policies, including life, property and casualty, per year. (N.T. 236–238). At the time Stella left Prudential, 624 policies of life, property and casualty insurance policies which he had sold remained in force with annualized premiums of $686,389. (N.T. 5–6, 135–141; Exhibit P–103).

18. Shortly after Defendant's resignation from Prudential, Prudential sent a letter to Stella's clients advising them that Stella had left his employment with the Prudential. (N.T. 136–137, 214–215).

19. In Stella's first year of employment with Allstate, he has sold approximately 250 policies of property and casualty insurance, one-quarter to one-third of which were sold to former Prudential clients. (N.T. 237–238).

20. Defendant, along with two other Prudential sales agents signed the lease, paid the rent and purchased much of the office equipment and supplies for the Castor Avenue office, including a computer. Defendant paid rent on and had a key to the Castor Avenue office at least through September, 1996. Following Defendant's resignation, a new Prudential sales agent, Fred Beck, assumed Defendant's share of the rent on the Castor Avenue office through the balance of the lease term. (N.T. 18–20, 63–65).

21. At the time of Stella's resignation from Prudential, Ari Horowitz, the then-general manager of Prudential's Pennypack Agency, asked Defendant to return to him his Prudential client record cards and files (OPSRs and PSRs). (N.T. 13–14, 125–126).

22. Approximately one week after he resigned, Defendant received a letter dated August 23, 1996 from Prudential Regional Vice President Daniel Danese advising him that the Prudential Rate Book, all OPSRs, DOPSRs, PSRs, client files, cash surrender, dividend withdrawal and loan forms and computer prepared illustrations to which he had access while with the Company were the property of Prudential and were to be returned, along with any copies of those documents. That letter further advised Defendant that Prudential had a property interest in each of its life insurance policies and that the Company believed that when a former representative replaces a life insurance policy that he sold or serviced, that representative has deprived Prudential of its property

interest and that the company would take appropriate action to protect its interests. Defendant did not receive any letter from Prudential cautioning him not to do business with property and casualty insurance customers. (N.T. 16–18, 232–234; Exhibit P–90).

23. Despite his conversations with Horowitz and the letter from Danese, Stella returned some but not all of the client cards and customer files in his possession and control to Prudential. (N.T. 11–18, 127–129; Exhibits P–91 through P–102).

24. After this lawsuit and Plaintiff's motion for preliminary injunction were filed, Defendant returned to Prudential every Prudential document in his possession, custody or control which he has been able to locate. With the exception of one occasion on which defendant reviewed documents to locate a client file in response to a request for information from Prudential Agent Colleen Sweeney, defendant did not look at, review or otherwise make use of any of the client files or cards between the time that he resigned from Prudential and the date on which he returned the documents to the Company. (N.T. 58–62; 127–129, 132–134).

25. On or around November 1, 1996, using a key which he still had to the premises, Defendant entered the Castor Avenue office and removed a computer which he had purchased, along with the other Prudential agents with whom he then shared the office. (N.T. 20–25, 64–65).

26. The computer contained Prudential rate information and quotes, information on specific Prudential customers and was loaded with Relay Gold software which would enable the computer user to access Prudential's mainframe computer through a modem if that user possessed a valid password. (N.T. 23–27).

27. Defendant Stella's password to Prudential's mainframe was inactivated on August 16, 1996. Without a valid password, the Relay Gold software could not be used to access the Prudential mainframe. (N.T. 66).

28. After taking the computer from the Castor Avenue office, Defendant did not use it but eventually gave it to a friend, who cleaned it up and subsequently sold it to an unidentified third party. (N.T. 24, 65–67, 225–226).

29. Generally, Prudential client files and cards are marked as "confidential" and "privileged" such that the information contained therein is to be used to develop a program of benefits for the client and his/her family. The files and cards contain information and facts generally provided by and regarding the client personally, such as the client's annual income, insurance goals and needs, payment history, and key dates as to when policies, certificates of deposit, annuities, etc. are due to renew. Much of this information is also contained in the company's computer system. (N.T. 7–9, 56–60, 129–134, 148–153, 224–225; Exhibits P–102, P–103).

30. Other than marking the client files and cards as "confidential" and "privileged," there is no evidence that Prudential did anything else to prevent the information contained in the client files and cards from ever being released to anyone or any entity outside the company's employ. (N.T. 60–64, 129–130, 148–158, 185–190).

31. There is no evidence that Defendant utilized any of Prudential's client files, cards or computer-stored data after he left Prudential's employ on August 16, 1996. (N.T. 65–67, 224–226).

32. After Defendant left Prudential, the client accounts and "book of business" which had been Defendant's was first re-assigned shortly thereafter to one Michael Gates. As Mr. Gates resumed a management position with the company sometime after late October, 1996, in January, 1997 Mr. Stella's former book of Prudential business was reassigned to Joseph Doyle. (136–137, 144–147, 240–242). With the addition of Defendant's accounts to his own, Mr. Doyle's book of business essentially doubled. (N.T. 243–244).

33. Although there is no evidence that Defendant initiated contact with any of his former Prudential clients after he left Prudential for the purpose of trying to sell them Allstate property and/or casualty insurance, approximately 20% of Stella's Prudential clients called him in the months immediately following his resignation and requested rate quotes and information on Allstate Insur-

ance. In the one-year following Defendant's departure from Prudential, he wrote 77 Allstate property and casualty insurance policies for former Prudential customers. (N.T. 28–57, 67–70, 162–168, 171–173, 183–186, 214–224; Exhibits P–6 through P–83).

34. The insurance industry is highly competitive and is driven more by price or rate than by service. In the case of most customers, regardless of how good an agent's service is, if the price or rate which he quotes to the customer is higher than that of another insurer, the customer will more often than not give his or her business to the agent with the lower rate. (N.T. 68–70, 138, 211–222, 245–249).

35. The rates which are quoted to a customer are not set by the individual agent, but are determined by the insurance company itself. Individual agents do not have the ability to cut or reduce or otherwise negotiate a rate for a customer or potential customer to coerce a customer to purchase insurance. Thus, a customer could contact any Allstate or Prudential agent and receive the same rate quote. (N.T. 69–70, 222, 245–249, 254–255).

36. Since May, 1997, Stella has not written any policy of insurance for anyone who was a former customer of his when he was affiliated with Prudential. (N.T. 192–193, 244–245).

37. Approximately 17% of the book of business which Stella serviced at Prudential was expected to dissipate in the course of normal attrition, without any relation to any of Defendant's actions or inactions following his departure from Prudential. (N.T. 141–142, 175–176).

38. Stella has not sold any Allstate life insurance policies to any of his former Pru-

dential life insurance clients. (N.T. 226–227; Exhibits P–6 through P–83).

### DISCUSSION

Prudential's five-count complaint seeks relief under the theories of breach of contract, conversion, breach of fiduciary duty, tortious interference with contractual relations and for misappropriation of trade secrets and unfair competition. As this court's jurisdiction is premised upon the diverse citizenship of the parties, Pennsylvania substantive law applies to each of these claims. *See: Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Griggs v. BIC Corp.,* 981 F.2d 1429, 1431 (3rd Cir.1992). While it does not dispute that Pennsylvania common law applies generally, however, plaintiff argues that because the restrictive covenants in defendant's agent's agreement are part of the collective bargaining agreement, it is Federal law and not that of Pennsylvania which should be applied to determine the issue of whether the restrictive covenants are supported by adequate consideration and are thus enforceable.[1] It is to this issue that we first turn.

### 1. *Enforceability of Restrictive Covenants*

If the resolution of a state-law claim substantially depends upon the meaning and analysis of a collective bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are states) is pre-empted and federal labor law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 406, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988); *Allis–Chalmers*

---

**1.** The requirements for a valid restrictive covenant in Pennsylvania are as follows: (1) the covenant must relate to a contract of employment (i.e., must be ancillary to an employment contract); (2) the covenant must be supported by adequate consideration; (3) the covenant must be reasonably limited in time and geographic territory; and, (4) the covenant must be necessary to protect the employer. *National Risk Management, Inc. v. Bramwell,* 819 F.Supp. 417, 429 (E.D.Pa.1993); *Gagliardi Bros., Inc. v. Caputo,* 538 F.Supp. 525, 527 (E.D.Pa.1982).

When an employee enters into an employment contract containing a covenant not to compete subsequent to employment, however, the covenant must be supported by new consideration which could be in the form of a corresponding benefit to the employee or a beneficial change in his employment status. *Davis & Warde v. Tripodi,* 420 Pa.Super. 450, 455, 616 A.2d 1384, 1387 (1992), citing, *inter alia, George W. Kistler, Inc. v. O'Brien,* 464 Pa. 475, 347 A.2d 311 (1975) and *Maintenance Specialties, Inc. v. Gottus,* 455 Pa. 327, 314 A.2d 279 (1974).

Corp. v. Lueck, 471 U.S. 202, 215, 105 S.Ct. 1904, 1913, 85 L.Ed.2d 206 (1985). See Also: International Brotherhood of Elec. Workers v. Hechler, 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987).[2]

■■■ However, the Supreme Court has made it clear that "not every dispute concerning employment, or tangentially involving a provision of a collective bargaining agreement, is pre-empted by § 301." Berda v. CBS, Inc., 881 F.2d 20, 23 (3rd Cir.1989), quoting Allis Chalmers v. Lueck, 471 U.S. at 211, 105 S.Ct. at 1911. Individual employment contracts are not necessarily superseded by a subsequent collective bargaining agreement covering an individual employee and claims based upon them may still arise and be maintained under state law. Caterpillar, Inc. v. Williams, 482 U.S. 386, 396, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987). A plaintiff covered by a collective bargaining agreement is permitted to assert legal rights independent of that agreement, including state law contract rights, so long as the contract relied upon is not a collective bargaining agreement. Id. Hence, resolution of a state law claim could depend upon both the interpretation of the collective bargaining agreement and a separate state law analysis that does not turn on the agreement. Antol v. Esposto, 100 F.3d 1111, 1116 (3rd Cir. 1996). See Also: Livadas v. Bradshaw, 512 U.S. 107, 114 S.Ct. 2068, 2077–2078, 129 L.Ed.2d 93 (1994).

■■■ It should further be noted that, unlike a standard commercial contract, a collective bargaining agreement binds both those members within a bargaining unit at the time the agreement is reached as well as those who later enter the unit. Gvozdenovic v. United Air Lines, Inc., 933 F.2d 1100, 1105 (2nd Cir.1991) citing J.I. Case Co. v. NLRB, 321 U.S. 332, 335–336, 64 S.Ct. 576, 579–580, 88 L.Ed. 762 (1944). An individual also need not be a union member to be a member of the bargaining unit for whose benefit the collective bargaining agreement was created as unions are obligated under § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a) to represent the interests of all employees in collective bargaining, including nonmembers. Quesnel v. Prudential Ins. Co., 66 F.3d 8, 11 (1st Cir.1995). Thus, an individual employee will be bound by the terms of a collective bargaining agreement even if not a union member. Id., citing Saunders v. Amoco Pipeline Co., 927 F.2d 1154, 1156 (10th Cir.1991).

In this case, plaintiff bases its claims for preliminary injunctive relief against defendant upon Sections 6(b), 6(c) and 14 of the Agent's Agreement which he signed on May 22, 1990, and upon the amendments made thereto by Article 26 of the collective bargaining agreement. (Pl's Complaint, ¶ s 6, 7, 8, 10, 11, 32–35). It is clear that Stella is a member of the bargaining unit for whose benefit the collective bargaining agreement was created and that he is therefore bound by the terms of the collective bargaining agreement between Prudential and the AFL–CIO & CLC. Accordingly, because the collective bargaining agreement amended the language of the restrictive covenants such that the amended language superseded that in the agent's agreement, it is evident that in order to resolve plaintiff's claims we must interpret and analyze the collective bargaining agreement. We are thus constrained to find that this claim is pre-empted and that federal common law must be applied.

As to the substantive content of this federal common law, while traditional rules of contract interpretation provide a plenteous resource, they should be mined only when compatible with federal labor policy. Luden's Inc. v. Local Union No.6, 28 F.3d 347,

**2.** The statute under which this principle has developed is Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), which reads:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without respect to the citizenship of the parties.

§ 301 has been held to apply to suits against individuals as well as against labor organizations where the suit is for breach by an individual of a collective bargaining agreement. See: John Hancock Mutual Life Ins. Co. v. Schwertmann, 627 F.Supp. 143, 144 (E.D.Mo.1985).

354 (3rd Cir.1994), citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 548, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964); *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 102–104, 82 S.Ct. 571, 576–577, 7 L.Ed.2d 593 (1962). In exhaustively reviewing those cases cited by the parties and following further independent research, however, this Court has been unable to unearth any authority outlining how restrictive covenants in collective bargaining agreements are to be analyzed with the exception of *John Hancock Mutual Life Ins. Co. v. Austin*, 916 F.Supp. 158 (N.D.N.Y.1996). In that case, after likewise concluding that no federal common law on the enforceability and construction of restrictive covenants in collective bargaining agreements has yet been formulated, the district court undertook to formulate such common law by looking to the relevant common law in the New York state courts. In so doing, the *Austin* court applied the same "reasonableness" test (in terms of duration, scope and geography) of the restrictive covenant as applied to the facts of the case being considered. *Id.*, at 163–164.

▮▮▮ The *Austin* court unfortunately was not confronted with and did not address the question of whether federal common law requires that the consideration to support a restrictive covenant must be provided contemporaneously with the execution or adoption of the agreement which contains it. In the field of labor relations, however, the technical rules of contract law do not determine the existence or enforceability of an agreement. *Mack Trucks, Inc. v. International Union, UAW*, 856 F.2d 579, 591–592 (3rd Cir.1988); *Bobbie Brooks, Inc. v. International Ladies' Garment Workers Union*, 835 F.2d 1164, 1168 (6th Cir.1987). *See Also: Ivaldi v. N.L.R.B.*, 48 F.3d 444, 448 (9th Cir.1995). Indeed, in order for a collective bargaining agreement to be found, all that is required is conduct manifesting an intention to be bound by the terms of an agreement. *Mack Trucks*, at 592; *Empire Excavating v. American Arbitration Association*, 693 F.Supp. 1557, 1562 (M.D.Pa.1988), aff'd. w/o opinion, 866 F.2d 1409 (3rd Cir.1988). Thus, using these basic labor principles as a guide, we reject defendant's argument pursuant to Pennsylvania law that to be enforceable, the restrictive covenants had to have been executed contemporaneously with the commencement of his employment with Prudential. We next address plaintiff's entitlement to injunctive relief.

### 2. *Plaintiff's Entitlement to Injunctive Relief*

▮▮▮ As the party seeking injunctive relief, the plaintiff bears the burden of proof. *Mettler–Toledo, Inc. v. Acker*, 908 F.Supp. 240, 245 (M.D.Pa.1995). The grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3rd Cir. 1989); *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3rd Cir.1988). At the trial level, the party seeking a preliminary injunction bears the burden of convincing the court that: (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of relief; (3) granting preliminary relief will not result in even greater harm to the other party; and (4) granting preliminary relief will be in the public interest. *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3rd Cir.1987). *See Also: Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90–91 (3rd Cir.1992); *S & R Corp. v. Jiffy Lube International, Inc.*, 968 F.2d 371, 374 (3rd Cir.1992).

▮▮▮ It should be noted that a showing of a mere risk of irreparable harm is not enough. A plaintiff has the burden of making a "clear showing of immediate irreparable (not merely serious or substantial) injury of a peculiar nature so that compensation in money cannot atone for it." *Campbell Soup*, at 91–92. Indeed, a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. *Id.; Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3rd Cir.1990); *ECRI*, 809 F.2d at 226.

▮▮▮ Furthermore, the preliminary injunction must be the only way of protecting the plaintiff from harm. *Instant Air Freight Co. v. C.F. Air Freight, Inc., supra*, 882 F.2d at 801. Finally, the basic purpose behind the

task of balancing the hardships to the respective parties is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the party seeking the injunction. *Opticians,* 920 F.2d at 196.

By way of its motion for preliminary injunctive relief in this case, Prudential is seeking to enforce sections 6 and 14 of the Agent's Agreement, as amended (and renumbered) by the collective bargaining agreement. Those sections concern (1) the loan of the Prudential books, records, documents, software, supplies and contractholder information (client files) and (2) a covenant not to compete following termination of defendant's employment with the company.

After carefully reviewing the evidence presented at the hearing on September 2, 1997, we cannot find that plaintiff has made the necessary showing that defendant's actions caused it and/or continue to threaten it with serious, irreparable harm such as is required for a preliminary injunction to issue. Indeed, as the evidence at the hearing makes clear, at the time he left Prudential, Stella was responsible for overseeing a "book" of business which consisted of 624 property, casualty and life insurance policies and in the one-year period following his departure from Prudential, Stella wrote 77 Allstate property and casualty insurance policies for former Prudential clients or about 12–13% of his former Prudential clientele. (N.T. 28–57, 67–70, 135–141, 162–168, 171–173, 183–186, 214–238; Exhibits P–6 through P–83, P–103).

Other than Mr. Sanfratello's suspicion that Stella was soliciting his former customers, there is also no evidence that defendant initiated contact with any of his former Prudential customers after he left Prudential to sell them insurance, although a number of them did contact him and asked for information on Allstate rates and products. (N.T. 28–57, 67–70, 162–168, 171–173, 178–186, 214–224). In any event, Stella has not sold any life insurance to any of his former life insurance customers nor has he sold any property, casualty or other insurance to anyone who was a former Prudential client since May,

1997. (N.T. 192–193, 226–227, 244–245; Exhibits P–6 through P–83).

Moreover, by the testimony of Prudential's own employees, approximately 17% of the book of business which Stella serviced at Prudential was expected to dissipate in the course of normal attrition, unrelated to any of Stella's actions after leaving the company. (N.T. 139–142, 175–176). Again, the evidence was clear that the insurance industry is an extremely competitive one, driven primarily by price—not service and price is set not by the individual agents but by the companies themselves such that a customer could contact any Allstate or Prudential agent and receive the same information provided by defendant. (N.T. 68–70, 138, 211–222, 245–249, 254–255).

Finally, while defendant admitted that he failed to return all of the client files (OPSR's, PSR's, etc.), cards and records which he had in his possession to Prudential until after Prudential filed this lawsuit and motion for preliminary injunction, Prudential has produced absolutely no evidence that Stella used any of these records or the computer after the date of his resignation on August 16, 1996. To be sure, the only evidence on this issue came from defendant, who repeatedly gave unrebutted testimony that he did *not* use any of these records or the computer after he left Prudential. (N.T. 11–18, 24, 58–62, 65–67, 127–129, 132–136, 160–164, 172–174, 225–226; Exhibits P–91 through P–102). As Prudential's own witness, John Sanfratello, testified, he is unaware of any benefit which would inure to Prudential as the result of a court order prohibiting Stella from dealing with his former clients. (N.T. 192–193). As all of this evidence demonstrates that the harm which Prudential has suffered, if any, by Stella's actions does not rise to the level of irreparability required for injunctive relief nor has there been any showing that an award of money damages would not be adequate to compensate it for the harm suffered. Plaintiff's motion for preliminary injunction shall therefore be denied in accordance with the following legal conclusions and attached order.[3]

3.  Insofar as this Court finds that the threshold    element for an award of injunctive relief has not

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties to this action pursuant to 28 U.S.C. § 1332.

2. Plaintiff has failed to prove to this Court that Defendant has used Prudential confidential customer information to divert former Prudential customers to Allstate for his own benefit.

3. Plaintiff has failed to prove to this Court that defendant has solicited his former Prudential customers to convert their Prudential insurance policies to Allstate.

4. Plaintiff has failed to prove that it is likely to suffer immediate, irreparable harm if the Defendant is not enjoined from using Prudential's customer files, cards and other information and soliciting and diverting Prudential customers.

5. The plaintiff has failed to prove that no adequate legal remedy is available to remedy the injury which it has suffered as a result of defendant's actions.

6. An award of preliminary injunctive relief to Plaintiff is not warranted based on the evidence presented.

An appropriate order follows.

## ORDER

AND NOW, this 10th day of February, 1998, upon consideration of Plaintiff's Motion for Preliminary Injunction and the evidence and arguments presented, it is hereby ORDERED that the Motion is DENIED.

been satisfied, we see no need to analyze the remaining elements of the preliminary injunction test.