**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2092**

AIRFACTS, INC.,

            Plaintiff – Appellant,

v.

DIEGO DE AMEZAGA,

            Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge. (8:15-cv-01489-DKC)

Argued: September 27, 2018                    Decided: November 20, 2018

Before AGEE and FLOYD, Circuit Judges, and John A. GIBNEY, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Floyd and Judge Gibney joined.

Nicholas Hantzes, HANTZES & ASSOCIATES, McLean, Virginia, for Appellant. Jerry R. Goldstein, JERRY R. GOLDSTEIN, P.C., Silver Spring, Maryland, for Appellee.

AGEE, Circuit Judge:

AirFacts, Inc. ("AirFacts") appeals from the district court's judgment after a bench trial in favor of Diego de Amezaga on AirFacts' breach of contract and misappropriation of trade secrets claims. *AirFacts, Inc. v. de Amezaga*, No. DKC 15-1489, 2017 WL 3592440 (D. Md. Aug. 21, 2017). For the following reasons, we affirm the judgment in part, vacate it in part, and remand to the district court for further proceedings consistent with this opinion.

I.

A.

Diego de Amezaga worked for AirFacts, a developer and licenser of revenue accounting software, from 2008 to 2015. AirFacts' primary product is TicketGuard, an auditing software that analyzes ticket fares for airlines and travel agencies to ensure tickets are sold for the appropriate price. TicketGuard's algorithms compare a ticket price to commissions, taxes, and airline industry rules like those collected by the Airline Tariff Publishing Company ("ATPCO").[1] An AirFacts employee conducts an automated audit by inputting ticket data into TicketGuard, running the software, and recording the ticket's proper price. If that price differs from the price for which the ticket sold, AirFacts issues a debit memo to the airline or travel agency that sold the ticket, and the airline or travel

---

[1] ATPCO, a private company, collects public fare data and makes it available to subscribers for a monthly fee.

agency under audit handles the refund process. AirFacts also audits ticket refunds for airlines and travel agencies, but it does not process ticket refunds for them.

At AirFacts, Mr. de Amezaga rose from a product development analyst to a director responsible for managing programmers and coders, developing analytical software, and managing client relationships. He worked under an Employment Agreement with AirFacts ("Agreement"), two paragraphs of which are at issue here. First, Paragraph 4.2 required Mr. de Amezaga to return all AirFacts property, including documents, upon leaving the company:

> Upon termination of his engagement with AirFacts for any reason, the Employee shall promptly deliver to AirFacts all equipment, computer software, drawings, manuals, letters, notes, notebooks, reports, and all other material and records of any kind, and all copies thereof (including copies on written media, magnetic storage or other computer storage media), that may be in the possession of, or under the control of, the Employee, pertaining to Confidential Information acquired and Inventions developed by the Employee during the term of his engagement with AirFacts. The Employee further agrees to fully disclose and deliver any of the above described materials in his possession and, at AirFacts's request, execute, upon his own (or his counsel's) review, any and all documents reasonably necessary to ensure and verify compliance with the terms of the Agreement.

J.A. 1213. On February 6, 2015, Mr. de Amezaga gave AirFacts his notice of resignation. Before he departed the company, Mr. de Amezaga's supervisors informed him that they might contact him if they had questions about his work after he left. On February 13, Mr. de Amezaga's final day at AirFacts, he emailed a spreadsheet outlining a proration

3

framework and a database model (collectively, "Proration Documents"), both relating to AirFacts' upcoming proration software product, to his personal email account.[2]

Prior to the end of his employment with AirFacts, the company had allowed Mr. de Amezaga and "a few" other employees to set up Lucidchart accounts to store and access company documents. J.A. 830. Lucidchart is an online document storage provider.

About a month after his AirFacts employment ended, Mr. de Amezaga used his AirFacts employee credentials to remotely log in to his AirFacts account on Lucidchart. From the Lucidchart account, Mr. de Amezaga downloaded two flowcharts displaying ticket price rules derived from the ATPCO and its Fare By Rule system ("Flowcharts"). Mr. de Amezaga had spent about four months at AirFacts creating the Flowcharts to display the rules, relevant processing information, and "things from [his] head" to make auditing tickets more systematic and easier for AirFacts employees. J.A. 827. After downloading the Flowcharts, he submitted them as a part of his job application to a travel agency. Except as noted, Mr. de Amezaga never accessed the Proration Documents or Flowcharts or disclosed them to anyone. AirFacts claims Mr. de Amezaga breached Paragraph 4.2 by retaining these documents after he resigned and misappropriated AirFacts' trade secrets by sending the Flowcharts to the travel agency.[3]

---

[2] The proration issues are discussed below.

[3] AirFacts alleged in the Complaint that Mr. de Amezaga misappropriated two other sets of trade secrets by sending one to a potential employer and printing the other. The district court held those documents were not trade secrets under the Maryland Uniform Trade Secrets Act, and AirFacts does not appeal those rulings.

4

The second paragraph of the Agreement at issue, Paragraph 8.1, imposed a non-compete restriction on Mr. de Amezaga's employment for a year after he left AirFacts. In Paragraph 8.1, Mr. de Amezaga agreed not to

> (d) [p]erform services for, own, work for, consult, be employed by, or become financially interested in any the [sic] employer's customers (as defined below) unless the services being performed is [sic] not in competition with, or similar to, either (i) the services or products provided by the employer during the term of the employee's employment or (ii) anticipated services or products of the employer of which the employee has material knowledge.

J.A. 1213. In 2014, American Airlines ("American") obtained a license from AirFacts to use TicketGuard as part of American's in-house ticket auditing process. American's Travel Agency Audit department audits domestic flight tickets sold by travel agencies and is the only department at American that uses TicketGuard.

Three months after leaving AirFacts, Mr. de Amezaga began working at American in the Refunds department, but only after he informed his future supervisors of the Agreement and its prohibitions on the types of work he could perform. American assured AirFacts that Mr. de Amezaga's work would not violate the Agreement and informed Mr. de Amezaga's new coworkers of his legal obligations to AirFacts.[4] At American, Mr. de Amezaga manages approximately 100 ticket refund employees whose task is to process ticket refunds directly to passengers. When passengers seek refunds directly from American, the airline uses proprietary software to analyze tickets under industry fare

---

[4] Mr. de Amezaga's future supervisor at American called AirFacts' CEO and informed her that Mr. de Amezaga's work would not violate the Agreement and that Mr. de Amezaga had signed a document for American to that effect.

rules and then issues refunds to passengers when appropriate. On one occasion, Mr. de Amezaga helped American's Travel Agency Audit department process a backlog of international flight ticket refunds. AirFacts contends Mr. de Amezaga has breached the Agreement through his work at American.

AirFacts also alleges Mr. de Amezaga breached the Agreement's restriction on providing services which are similar to AirFacts' anticipated products. Specifically, while at AirFacts, Mr. de Amezaga helped to develop customized proration software for airlines. Proration occurs when a passenger buys a multi-airline ticket for a trip and the ticket revenue must be prorated among each airline pursuant to negotiated airline agreements and industry standards. AirFacts developed its proration product to help an airline recoup the revenue due for its leg of the trip. Mr. de Amezaga helped to develop and market the proration software to American and Alaska Airlines ("Alaska"), but only Alaska purchased the customized product. Although the software was unfinished when Mr. de Amezaga left, he spent about fifty percent of his final months at AirFacts working on the proration product.

Since joining American, Mr. de Amezaga has, among his duties, attended weekly staff meetings that included senior employees of American's Proration department, received intra-company emails addressed to him as well as Proration department employees, and coordinated between the Revenue Accounting department (the Refunds department's parent) and the Proration department on an accounting project. AirFacts claims Mr. de Amezaga's interaction with American's Proration department employees

6

constitutes a breach of the Agreement in light of his intimate prior knowledge of the proration software AirFacts was developing when he resigned.

B.

AirFacts sued Mr. de Amezaga in the District of Maryland[5] for breach of contract under Paragraphs 4.2 and 8.1 of the Agreement (Count One); misappropriation of trade secrets under the Maryland Uniform Trade Secrets Act ("MUTSA") (Count Two); and conversion (Count Three). AirFacts also sought injunctive relief to protect the documents Mr. de Amezaga took, and the district court entered a temporary restraining order prohibiting Mr. de Amezaga from destroying any AirFacts documents. Later, the Parties consented to a preliminary injunction requiring Mr. de Amezaga to return all AirFacts documents and allowing AirFacts to forensically search his electronic devices. The forensic searches confirmed that Mr. de Amezaga did retain the documents integral to the claims on appeal after his termination of employment with AirFacts.

The court held a five-day bench trial during which AirFacts abandoned its conversion claim, admitting that it "ha[d]n't been able to establish" that Mr. de Amezaga deprived AirFacts of any documents. J.A. 1010; *see* 2017 WL 3592440, at *3. In its memorandum opinion, the court concluded that AirFacts had also abandoned its Paragraph 4.2 breach of contract claim. The court thus analyzed Count One only as to Paragraph 8.1 of the Agreement and found that Mr. de Amezaga's work at American was neither similar to AirFacts' work nor in competition with AirFacts' proration product. On

---

[5] The district court had diversity jurisdiction because AirFacts is a Delaware corporation headquartered in Maryland and Mr. de Amezaga is a Virginia citizen.

Count Two, the court found that the Flowcharts contained public information and were widely available to AirFacts' employees, and it concluded those documents were not trade secrets under the MUTSA. And while the court held the Proration Documents were MUTSA trade secrets, the court found that Mr. de Amezaga did not misappropriate those documents because he accessed them with authorization while he was an AirFacts employee. Consequently, the court entered judgment for Mr. de Amezaga on all counts. AirFacts timely appealed, and this Court has jurisdiction under 28 U.S.C. § 1291.

## II.

"We review a judgment following a bench trial under a mixed standard of review—factual findings may be reversed only if clearly erroneous, while conclusions of law . . . are examined de novo." *Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005).

## III.

We first address AirFacts' two breach of contract challenges, applying Maryland law under the Agreement's choice of law provision. J.A. 1213 ("This Agreement shall be subject to and governed by the internal laws of the State of Maryland . . . .").

### A.

The district court found that AirFacts "narrowed its [breach of contract] claim during trial to a breach of [P]aragraph 8, the non-solicitation of clients provision," thereby abandoning its claim under Paragraph 4.2 for Mr. de Amezaga's retention of

8

documents. 2017 WL 3592440, at \*3. This statement was the district court's only mention of the Paragraph 4.2 claim. On appeal, AirFacts contends that it never abandoned the claim and that the district court was therefore required to address the claim. Mr. de Amezaga responds that AirFacts did "expressly" abandon the Paragraph 4.2 claim in closing argument when the district court requested a summary of Count One and AirFacts did not specifically mention Paragraph 4.2 in response. Response Br. 15.

1.

Because an order failing to address all claims is not a final, appealable order, we must first ensure that we have jurisdiction over this appeal. *See Harrington v. Carlough*, No. 97-2710, 1999 WL 92419, at \*2 (4th Cir. Feb. 24, 1999) (unpublished table decision) (per curiam). Since the district court did not rule on the merits of the Paragraph 4.2 claim, we directed the Parties to provide supplemental briefs on the issue of whether, if AirFacts did not abandon its Paragraph 4.2 claim, the district court's order was a final order over which we have jurisdiction under 28 U.S.C. § 1291. *See* ECF No. 35. The Parties both contended that appellate jurisdiction does exist. Having carefully examined the record and relevant case law, we agree.

This is not a case in which a court entirely overlooked a party's claim. *Cf. Harrington*, 1999 WL 92419, at \*2. Rather, the court addressed AirFacts' Paragraph 4.2 claim, albeit summarily, in deeming it abandoned. Furthermore, the district court's order lacks any indication that the court intended it to be anything but final: "[J]udgment will be entered in favor of [Mr. de Amezaga] on all counts in the complaint." 2017 WL 3592440, at \*15; *see Martin v. Duffy*, 858 F.3d 239, 246 (4th Cir. 2017) ("[A]n order that

9

fails to explicitly address or dispose of all claims presented to the court may nevertheless qualify as a final, appealable order if [its] language . . . is calculated to conclude all the claims before the district court . . . ." (internal quotation marks omitted)). We therefore conclude there is a final, appealable order.

2.

Satisfied that we have jurisdiction, we turn to the court's determination that AirFacts abandoned its Paragraph 4.2 claim. Upon review of the record, particularly the closing argument transcript and AirFacts' filings, we cannot "fairly draw[ ]" an inference of abandonment. *See Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014). Accordingly, we reverse the district court's finding that AirFacts abandoned its Paragraph 4.2 claim and vacate its judgment in that regard.

Whether a claim was abandoned is "a primarily factual finding" we review for clear error. *Ellis v. United Airlines, Inc.*, 73 F.3d 999, 1003 (10th Cir. 1996), *overruled on other grounds by Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005). If not express, abandonment must be clear and unambiguous. *See Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 463 (4th Cir. 2013) ("The defendants cite no authority, nor can we find any, holding that an ambiguous statement made during oral argument waives an argument clearly raised in a brief."); *Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15, 32 (D.D.C. 2007) (noting the complaint controls "in the absence of an *express* and *explicit* indication that the plaintiff intended to leave one or more of [its] claims by the wayside"). To determine whether acts constitute clear and unambiguous abandonment, we weigh several commonsense factors: whether the party failed to advance the claim on

10

appeal, failed to argue that the district court erred in not addressing it, or otherwise represented that it did not intend to pursue the claim. *See, e.g.*, *Duberry v. Postmaster Gen.*, 652 F. App'x 770, 772 n.2 (11th Cir. 2016) (per curiam) (holding a party abandoned a claim when it failed to advance it on appeal or argue the district court erred in dismissing it); *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 236 & n.2 (5th Cir. 2010) (holding a party abandoned a case theory when it agreed its case would "rise or fall" on another theory and did not correct opposing counsel's characterization that the first theory was waived); *Harrington*, 1999 WL 92419, at *2 (holding a party did not abandon a claim it had briefed in its proposed Conclusions of Law in the trial court, argued was still in play on appeal, and "disclaim[ed] any intention" to abandon).

AirFacts' consistent representations preclude a finding of abandonment. First, the Paragraph 4.2 claim was clearly pled in Count One of the Complaint, specifically in Paragraph 40. Second, AirFacts briefed and pursued the Paragraph 4.2 claim in the trial court, including by outlining the Paragraph 4.2 contentions in a joint pretrial order and expressly stating it was "not abandon[ing] any issue set forth in its pleadings." No. 8:15-cv-01489-DKC, ECF No. 49 at 4–8, 21; *see Harrington*, 1999 WL 92419, at *2.

Third, in its factual summary at closing, AirFacts reviewed the document retention evidence that supports the Paragraph 4.2 claim. Though it did not expressly tie that evidence to the Paragraph 4.2 claim, AirFacts explained that evidence in relation to the MUTSA claims, both of which depend on the alleged trade secret documents that Mr. de Amezaga retained (contrary to his duties under Paragraph 4.2) after he left AirFacts. *Compare* J.A. 958–59 (factual summary) *with* J.A. 994–95 (MUTSA claims argument).

Fourth, while AirFacts did not specifically argue the Paragraph 4.2 claim at closing, neither did it expressly abandon the claim. In arguing AirFacts abandoned the claim, Mr. de Amezaga relies on AirFacts' failure to include a specific Paragraph 4.2 reference in response to the court's request for a summary of Count One. Indeed, neither Party mentioned the Paragraph 4.2 claim at closing. And when Mr. de Amezaga in his closing characterized AirFacts' argument as "just talking about section—[P]aragraph 8 of the contract," J.A. 1029, AirFacts did not refute that characterization. However, Mr. de Amezaga never specifically argued to the district court that AirFacts abandoned the Paragraph 4.2 claim.

These facts do not constitute abandonment because AirFacts' failure to address Paragraph 4.2 was at most ambiguous, not a clear and express abandonment of the claim. *See Santos*, 725 F.3d at 463 ("[A]n ambiguous statement made during oral argument [does not] waive[ ] an argument clearly raised in a brief."). And on appeal, AirFacts has directly challenged the district court's ruling on the Paragraph 4.2 claim and briefed the claim on its merits. *Contra Duberry*, 652 F. App'x at 772 n.2 ("Because [the plaintiff] makes no argument that she did not abandon her contract claim or that the district court otherwise erred in implicitly disposing of it, any breach-of-contract argument has been abandoned on appeal.").

We liken these facts to those in *Ellis*, an age discrimination case, in which the plaintiffs at summary judgment stressed their disparate impact claim over their disparate treatment claim and stated that success on the latter in light of recent case law "might be difficult." 73 F.3d at 1004. Though the plaintiffs expressly declined to abandon their

disparate treatment claim, the district court relied on the summary judgment statements to hold it was abandoned. *Id.* at 1003–04. On appeal, the Tenth Circuit weighed the plaintiffs' concession of difficulty against their "articulat[ion of] the legal and factual basis for their disparate treatment claim" in their briefs and concluded the concession did not constitute abandonment. *Id.* at 1004. Similarly, in *Hunt v. City of Los Angeles*, the Ninth Circuit remanded a statutory claim the plaintiffs had not abandoned despite their assertion that their case "center[ed]" on two other statutory provisions they were "primarily challenging." 638 F.3d 703, 718–19 (9th Cir. 2011). Because the plaintiffs "asserted only that they were primarily challenging the other two ordinances, not that they were dropping their claims regarding [the third]," the Ninth Circuit held that the district court incorrectly deemed the claim abandoned. *Id.* at 719.

Just as those lower courts could not fairly construe the plaintiffs' oral argument statements as abandonment, the district court could not do so here. While AirFacts' failure to address the Paragraph 4.2 contentions in closing may have been sloppy advocacy, that failure did not rise to a clear and unambiguous abandonment of a claim it had consistently pursued throughout the case. Consequently, applying our commonsense standards for claim abandonment, we hold the district court clearly erred in holding AirFacts abandoned its Paragraph 4.2 contentions. We thus vacate the district court's judgment on the Paragraph 4.2 claim and remand for consideration on the merits.[6]

---

[6] AirFacts broadly alleged Count One of the Complaint as "Breach of Contract," incorporating by reference citations to Paragraphs 2, 4.2, 7.2, and 8.1 of the Agreement. J.A. 16. On appeal, AirFacts challenges the district court's conclusion that all claims but (Continued)

B.

Turning to AirFacts' breach of contract claim for violation of the Paragraph 8.1(d) non-compete clause, the Agreement prohibits Mr. de Amezaga from performing any services for an AirFacts "customer" which are "in competition with, or similar to, either (i) the services or products provided by the employer during the term of the employee's employment or (ii) anticipated services or products of the employer of which the employee has material knowledge." J.A. 1213. It is undisputed that American was an AirFacts customer while Mr. de Amezaga worked at AirFacts.[7]

1.

For one year after his departure from AirFacts, Mr. de Amezaga was prohibited from providing services to a new employer "in competition with, or similar to" the services "provided by [AirFacts]" during his employment with AirFacts. J.A. 1213. According to the plain language of Paragraph 8.1(d)(i), in this inquiry we must compare Mr. de Amezaga's work at American to the services AirFacts provided to any customer during his employment at AirFacts. We accept the trial court's credibility assessments

---

the Paragraph 8.1 claim were abandoned, but it mentions only Paragraphs 2 and 4.2. Thus, AirFacts has waived any Paragraph 7.2 claim. *See* Fed. R. App. P. 28(a)(8)(A). The Parties mainly analyze the Paragraph 4.2 claim on appeal, but to the extent the district court's erroneous abandonment conclusion affected Paragraph 2, that claim is also live. On remand, the district court should address the merits of both the Paragraph 2 and 4.2 claims.

[7] Paragraph 8.2 of the Agreement defines "customer" as a "customer who within the twelve months prior to the date of employee's termination has been a customer of the employer." J.A. 1213. Because American began using TicketGuard in late 2014 and Mr. de Amezaga resigned in February 2015, American was an AirFacts "customer" during the relevant time period. *See* 2017 WL 3592440, at *2 n.4, *3.

14

and address only the legal question of whether Mr. de Amezaga's work at American and AirFacts' services are competing or similar.

As a manager in American's Refunds department, Mr. de Amezaga's main responsibilities are processing refunds, managing processing employees, and advising other departments how to optimize procedures. To process passenger refunds, Mr. de Amezaga uses American's proprietary software, but he does not use TicketGuard because he does not audit tickets. Only American's Travel Agency Audit department uses TicketGuard. Even when Mr. de Amezaga assisted that department with a ticket backlog, it was to process refunds, not to conduct audits.

AirFacts, on the other hand, conducts its contract audits using TicketGuard or licenses TicketGuard to an airline to audit its own tickets. The record reflects that AirFacts does not process refunds, offer managerial services, or advise its customers about optimizing their internal processes. And even though AirFacts does use TicketGuard to audit ticket *refunds*, AirFacts presented no evidence that Mr. de Amezaga or American "*processes* refunds in a way that is at all similar to the TicketGuard process for *auditing* refunds." 2017 WL 3592440, at *5 (emphases added).

AirFacts argues that because ticket audits and ticket refunds both compare a ticket's price to industry rates and rules, the processes are similar. In AirFacts' view, when Mr. de Amezaga processes refunds at American, he is mimicking his audit work at AirFacts, despite the differences in his new title and department. Nonetheless, AirFacts concedes that the audit and refund functions have distinct purposes and end recipients: the ticket seller under an audit versus the passenger in a refund claim. These distinctions

15

are significant and confirm that Mr. de Amezaga's work at American is not "in competition with" or "similar to" AirFacts' services. Consequently, he has not breached Paragraph 8.1(d)(i).

2.

We likewise conclude that Mr. de Amezaga did not breach Paragraph 8.1(d)(ii) by working at American despite his knowledge of AirFacts' anticipated proration product. The Agreement prohibits Mr. de Amezaga from providing services "in competition with, or similar to" the "anticipated services or products of the employer of which the employee has material knowledge." J.A. 1213. Again, we must compare Mr. de Amezaga's work at American to the services AirFacts anticipated providing through its proration product during the time of his employment.

Mr. de Amezaga had material knowledge of AirFacts' proration product because he assisted in marketing it to American and Alaska on AirFacts' behalf. In his final months at AirFacts, he spent half of his time developing Alaska's customized proration software.

However, Mr. de Amezaga offers no proration services at American, and American informed his coworkers that he was prohibited from doing so. Mr. de Amezaga does no work for the Proration department and offers no proration services at American because proration is outside his Refunds department job duties. AirFacts' evidence of any tasks even tangential to proration is scant: Mr. de Amezaga attends staff meetings that sometimes include Proration department employees, reads company emails sent to him and Proration employees, and once coordinated an accounting project between the

16

Revenue and Proration departments. The district court properly considered that work at American insufficiently similar to or in competition with AirFacts' proration software and thus correctly held Mr. de Amezaga did not breach Paragraph 8.1(d)(ii).

Consequently, we affirm the district court's judgment on Count One as to the Paragraph 8.1 claim.

IV.

We now turn to AirFacts' Maryland trade secrets claims. "To prove misappropriation of a trade secret [under the MUTSA], a plaintiff must show (1) that it possessed a valid trade secret, (2) that the defendant acquired its trade secret, and (3) that the defendant knew or should have known that the trade secret was acquired by improper means." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993) (citing Md. Code Com. Law § 11-1201(c)(1)).

> Under the MUTSA, a "trade secret" is
>
> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1)    Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (2)    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md. Code Com. Law § 11-1201(e). Before the MUTSA was codified, Maryland applied the Restatement's factor-based definition of "trade secret," which remains useful in a

17

MUTSA analysis. *Trandes*, 996 F.2d at 661. Under the Restatement, a trade secret can be identified by:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount or effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Restatement (First) of Torts* § 757 cmt. b.

After demonstrating an item is a trade secret, a plaintiff must show that the defendant has misappropriated it. *Trandes*, 996 F.2d at 660. "Misappropriation" under the MUTSA is, in relevant part, "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who" improperly acquired it or knew another person improperly or mistakenly acquired it. Md. Code Com. Law § 11-1201(c).

AirFacts contends Mr. de Amezaga misappropriated its trade secrets by taking the Flowcharts and Proration Documents.

A.

Addressing the first element of the MUTSA claim, the district court concluded that the Flowcharts are not trade secrets because they are simply an "overview" of publicly available ATPCO information that AirFacts did not own. 2017 WL 3592440, at *10. As a consequence, the district court held there was no MUTSA claim regarding the retained Flowcharts. We disagree.

18

A trade secret both derives independent economic value from being secret—at least not readily ascertainable by third parties—and enjoys reasonable efforts to maintain its secrecy. Md. Code Com. Law § 11-1201(e); *see EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 545 (D. Md. 2014). The evidence at trial demonstrated the Flowcharts are independently valuable and AirFacts preserved them as such.

First, the Flowcharts are valuable because they contain information not readily ascertainable to outsiders. Though anyone with a subscription can access the ATPCO data, Mr. de Amezaga spent months compiling it in particular groupings and applying his ATPCO expertise to display that compiled information in a useful format. Courts have long recognized that "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Imperial Chem. Indus. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1965) (collecting cases); *see also Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc.*, 3 F.3d 730, 736 (4th Cir. 1993) ("[A]lthough a trade secret cannot subsist in information in the public domain, it can subsist in a *combination* of such information, as long as the combination is itself secret."), *vacated pursuant to settlement*.

Mr. de Amezaga's painstaking, expert arrangement of the ATPCO data made the Flowcharts inherently valuable separately and apart from the publicly available contents. It is the value Mr. de Amezaga added by incorporating "things from [his] head" that establishes the Flowcharts as unique items of economic value in AirFacts' field of endeavor. J.A. 827; *see Motor City Bagels, L.L.C. v. Am. Bagel Co.*, 50 F. Supp. 2d 460,

473–79 (D. Md. 1999) (noting the trade secrets at issue "include[d] personal insights and analysis brought to bear through diligent research and by marshaling a large volume of information" and "an attempt to independently duplicate the plaintiffs' efforts . . . would be an onerous task"); *Mettler–Toledo, Inc. v. Acker*, 908 F. Supp. 240, 247 (M.D. Pa. 1995) ("The fact that individual pieces of information claimed to be confidential are available to the general public does not defeat a claim of confidentiality if the value of the information stems from its compilation or collection in a single place or in a particular form which is of value."); *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1322 (N.D. Ill. 1990) ("[T]he effort of compiling useful information is, of itself, entitled to protection even if information is otherwise generally known."); *Space Aero Prods. Co. v. R. E. Darling Co.*, 208 A.2d 74, 79 (Md. 1965) ("The subject-matter capable of protection may be an industrial secret like a machine, process, or formula, or it may be industrial know-how [or] information of any sort [or] the product of work, or expenditure of money, or of trial and error, or the expenditure of time."); *Restatement (First) of Torts* § 757 cmt. b (5)–(6) (noting value can be imputed by effort and time expended and difficulty of replication). The Flowcharts fit these descriptions as trade secrets.

Second, the Flowcharts are valuable because they would improve AirFacts' efficiency in the performance of its contractual obligations. AirFacts' CEO testified that auditors using the Flowcharts would be able to analyze Fare by Rule tickets faster than they could unaided. That the Flowcharts "did not contain information or processes unique to [AirFacts]," 2017 WL 3592440, at *10, confirms that the Flowcharts would be useful to any AirFacts competitor conducting Fare by Rule audits because they succinctly

20

display the vast amounts of ATPCO data required for that type of audit. *See Motor City Bagels*, 50 F. Supp. 2d at 479 (holding documents were valuable because of the effort expended to compile publicly available information). *Contra Diamond v. T. Rowe Price Assocs.*, 852 F. Supp. 372, 412 (D. Md. 1994) ("While these documents may have some utility to T. Rowe Price, there is no evidence that they have any independent economic value for anyone else."). For these two reasons, the Flowcharts have independent economic value.

Finally, AirFacts took reasonable steps to maintain the Flowcharts' secrecy. Even if widespread use within the company was their "intended purpose," we find no evidence in the record for the district court's conclusion that "the flowcharts themselves appear to have been widely known to Plaintiff's employees." 2017 WL 3592440, at *10.[8] On the contrary, AirFacts required all employees to sign confidentiality agreements, installed monitoring software on every computer to track employees' actions, and specifically protected the Flowcharts by giving only "a few" employees access to AirFacts'

---

[8] Even if the Flowcharts were widely known within the company and used by AirFacts' auditing employees, that factor alone would not necessarily thwart trade secret status. What use is a trade secret if its owner cannot use it to its advantage in the marketplace? And to do so, the owner's employees must be able to use the advantageous tool or information to serve customers better than their competitors. This principle comports with weighing employee knowledge against the finding of a trade secret when those employees do not need the knowledge to do their jobs. *See Restatement (First) of Torts* § 757 cmt. b (including as a factor in trade secret status "the extent to which [information] is known by employees"). If AirFacts published the Flowcharts to their auditing employees but not to the cleaning staff, the Flowcharts' secrecy would not decrease. What matters is the efforts AirFacts took to preserve the Flowcharts' confidential status outside of the normal scope of their restricted use within AirFacts' business.

Lucidchart accounts. J.A. 830. We agree with the reasoning of the District of Maryland in *Albert S. Smyth Co. v. Motes*, in which it recently found that a company's imposing a confidentiality policy and restricting access to electronic documents contributed to finding the documents at issue were trade secrets. No. CCB-17-677, 2018 WL 3635024, at *3 (D. Md. July 31, 2018) (noting the company prohibited employees from disclosing company information, instructed employees how to keep information safe, and stored records on encrypted servers to which few employees had access); *see also Restatement (First) of Torts* § 757 cmt. b (2)–(3). Therefore, we conclude the district court erred in holding the Flowcharts are not trade secrets and vacate and remand this claim for the district court to address in the first instance whether Mr. de Amezaga misappropriated these trade secrets.

B.

Finally, we address AirFacts' trade secrets claim relating to the Proration Documents. Mr. de Amezaga emailed the Proration Documents to his personal email account on his last day of employment at AirFacts. The framework and database model, which he had developed for AirFacts, condensed information from airline proration agreements into a more concise format that AirFacts could use in developing its proration product. AirFacts intended to use the Proration Documents to demonstrate to Alaska how its custom proration product would work. The district court held that these documents are trade secrets because they were part of AirFacts' "proration engine under development," but that Mr. de Amezaga did not misappropriate the Proration Documents because he

22

accessed them in the scope of his employment and emailed them to himself only to answer questions from AirFacts after he resigned. 2017 WL 3592440, at \*11.

AirFacts appeals the district court's misappropriation ruling. Because we follow the district court's credibility determination that Mr. de Amezaga accessed the Proration Documents with authorization and did not intend to access, use, or send them to anyone (but his AirFacts supervisors) after his last day at AirFacts, we affirm.

Even if an employee does not disclose trade secrets to a third party, he can misappropriate those trade secrets if he knows or has reason to know he acquired them "by improper means." Md. Code Com. Law § 11-1201(c)(1); *see LeJeune v. Coin Acceptors, Inc.*, 849 A.2d 451, 465–66 (Md. 2004). Consequently, we must consider the facts surrounding Mr. de Amezaga's acquisition of the Proration Documents: he helped to create them and worked on them through his final day at AirFacts; AirFacts employees occasionally worked remotely and used their personal email accounts to send and save company documents; Mr. de Amezaga's superiors asked him to be available to answer questions after he resigned; the AirFacts employees who contacted Mr. de Amezaga after he resigned did not ask questions about the proration project; and Mr. de Amezaga never accessed the Proration Documents in his personal email account after he resigned.

Relying on these facts, the district court found credible Mr. de Amezaga's testimony that he emailed the Proration Documents to himself so he could answer AirFacts employees' questions about the proration project. Even though AirFacts' computer monitoring software revealed that Mr. de Amezaga deleted the email he sent to himself from his company computer, the district court concluded that "this is not

23

convincing evidence that Defendant knew his actions were improper and intended to hide those actions." 2017 WL 3592440, at *12. In addition, the district court likened these facts to those in *Diamond*, in which a former employee retained company documents at her home that her employer had regularly sent to her during her employment because she was authorized to work from home. 852 F. Supp. at 412 & n.193. Taking the facts as the district court found them, we perceive no legal error in the district court's conclusion that Mr. de Amezaga did not misappropriate the Proration Documents in emailing them to himself for continued AirFacts business. Accordingly, we affirm.

V.

For the foregoing reasons, we vacate the district court's judgment on Count One as to the Paragraph 4.2 breach of contract claim and on Count Two as to the Flowcharts MUTSA claim and remand these claims for further proceedings consistent with this opinion. We affirm the remainder of the district court's judgment.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*