**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-2344**

AIRFACTS, INC.,

        Plaintiff − Appellant,

    v.

DIEGO DE AMEZAGA, an individual,

        Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge. (8:15−cv−01489−DKC)

Argued: December 9, 2021                       Decided: April 6, 2022

Before AGEE and DIAZ, Circuit Judges, and FLOYD, Senior Circuit Judge.

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Diaz wrote the opinion, in which Judge Agee and Senior Judge Floyd concurred.

Nicholas Hantzes, HANTZES & ASSOCIATES, McLean, Virginia, for Appellant. Jerry R. Goldstein, JERRY R. GOLDSTEIN, P.C., Rockville, Maryland, for Appellee.

DIAZ, Circuit Judge:

AirFacts, Inc. appeals—for the second time—the district court's judgment for the company's former employee, Diego de Amezaga. AirFacts sued Amezaga for breaching his employment agreement and misappropriating trade secrets under the Maryland Uniform Trade Secrets Act. In *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84 (4th Cir. 2018) ("*AirFacts I*"), we vacated the district court's judgment for Amezaga on several breach-of-contract claims and one misappropriation claim. On remand, the court once again found for Amezaga.

AirFacts appealed. It argues that the district court erred in (1) awarding AirFacts only nominal damages for certain contract claims; (2) finding that Amezaga didn't breach the employment agreement as to other claims; and (3) refusing to award AirFacts reasonable royalty damages for Amezaga's trade secrets violation. As we explain, we affirm in part, reverse in part, vacate in part, and again remand to the district court for proceedings consistent with this opinion.

I.

A.

AirFacts develops and licenses revenue accounting software. The company's primary product is TicketGuard, which audits airline ticket sales. In 2008, Amezaga began working for AirFacts as a product development analyst. The company later promoted him to manager and then director of product development. His responsibilities included

2

managing programmers and coders, developing new software, and handling client relationships.

When Amezaga first joined AirFacts, the parties signed an employment agreement. Paragraph 4.2 of the agreement required Amezaga to return all documents containing confidential information to AirFacts before he left the company. Paragraph 2.2 barred Amezaga from disclosing confidential information to third parties and clarified that all such information is AirFacts's property. The agreement also contained an indemnification clause, which provided,

> Employee shall defend, indemnify and hold harmless AirFacts . . . from any losses, liabilities, damages, demands, suits, causes of action, judgments, costs or expenses (including court costs and reasonable attorney's fees) resulting from or directly or indirectly arising out of any material breach of any material provision of this Agreement by Employee.

J.A. 1422.

During his tenure at AirFacts, Amezaga worked to develop and pitch a new "proration" software. The software would help airlines ensure they receive the appropriate share of a multi-airline ticket sale. AirFacts began development in 2012, and in early 2014, Alaska Airlines agreed to purchase the software.

Amezaga resigned from AirFacts in February 2015. During his last week, he printed out documents related to a project he'd been working on ("pseudocode"). And on his last day, he sent documents related to the new proration software to his personal email account because his superiors told him they may reach out with questions about his work. AirFacts says it told Alaska Airlines about this alleged data breach and then redeveloped part of the software to the tune of nearly $100,000.

3

A few weeks after leaving AirFacts, Amezaga applied for a job at Fareportal, a travel agency. Fareportal is neither AirFacts's customer nor competitor, but AirFacts, on behalf of its airline clients, has used TicketGuard to audit Fareportal's ticket sales. In connection with his application, Amezaga sent Fareportal two flowcharts he'd created for AirFacts displaying ticket price rules, relevant processing information, and "things from [his] head" to streamline the auditing process ("the flowcharts"). J.A. 830. He downloaded the flowcharts from Lucidchart, an online document-storage provider, using his AirFacts employee credentials. Amezaga says he only sent Fareportal the flowcharts to help them understand the work he did for AirFacts.

## B.

AirFacts sued Amezaga for breaching several provisions of his employment agreement and misappropriating trade secrets. After a bench trial, the district court entered judgment for Amezaga on all counts. The court first held that AirFacts had abandoned all its contract claims except one alleging that Amezaga breached the employment agreement's noncompete clause, which the court then rejected.[1]

It then turned to AirFacts's trade secrets claims. AirFacts argued that Amezaga misappropriated its trade secrets by taking the flowcharts and proration documents. The court rejected the claim for two reasons. First, it held the flowcharts weren't trade secrets. And second, it said that Amezaga didn't misappropriate the proration documents—which

---

[1] We affirmed the district court's judgment for Amezaga on the noncompete claim. *AirFacts I*, 909 F.3d at 95. There's no live dispute on this issue.

4

were trade secrets—because he accessed them with authorization while he was still an AirFacts employee.

In *AirFacts I*, we revived some of the company's contract claims and one of its misappropriation claims. First, we said that AirFacts had preserved its claims that Amezaga breached paragraphs 2 and 4.2 of the employment agreement. *AirFacts I*, 909 F.3d at 93, 93 n.6. So we remanded those claims for the district court to consider in the first instance. *Id.* at 93. Then, as for AirFacts's trade secrets claims, we agreed that Amezaga didn't misappropriate the proration documents. *Id.* at 98. But contrary to the district court, we found that the flowcharts were trade secrets. *Id.* at 96–97. We then left it to the district court to decide whether Amezaga misappropriated them under the Maryland statute. *Id.* at 97.

On remand, the district court first addressed AirFacts's breach-of-contract claims. It considered whether Amezaga breached paragraphs 2.2 or 4.2 of the employment agreement by (a) accessing his company Lucidchart account, downloading the flowcharts, and sending them to Fareportal; (b) saving the proration documents; (c) printing the pseudocode; or (d) retaining two more documents—a straight sales processing diagram and a home commission table[2]—that AirFacts's experts found on Amezaga's devices after litigation began.

---

[2] Amezaga helped create the straight sales processing diagram, which "shows the core of AirFacts'[s] processing logic for the TicketGuard software and diagrams that entire system." J.A. 1253. The home commission table relates to AirFacts's travel agency commission audits. It "hous[es], synthesiz[es], and creat[es] a structure for all of the commission information and data necessary to conduct commission audits." J.A. 1252.

The court issued three rulings on these claims. First, it held that Amezaga breached paragraph 2.2 as to the flowcharts and paragraph 4.2 as to the straight sales processing diagram and home commission table. But it said these breaches were de minimis. And because the employment agreement's indemnification clause limited AirFacts's right to recover damages, fees, and costs to those attending *material* breaches, the court awarded only nominal damages.

Second, the court held Amezaga didn't breach paragraph 4.2 by printing the pseudocode because it didn't contain "confidential information" under the agreement. And third, it determined that retaining the proration documents—which were "confidential information"—didn't violate paragraph 4.2 because Amezaga had "implicit authority to keep these materials." *AirFacts, Inc. v. Amezaga*, 502 F. Supp. 3d 1027, 1037 (D. Md. 2020).

The district court then addressed AirFacts's trade secrets claim. It concluded that Amezaga misappropriated trade secrets—the flowcharts—because he improperly acquired and disclosed the documents without consent. AirFacts sought only reasonable royalty damages because it couldn't prove any specific injury. But despite discussing AirFacts's damages expert's testimony in detail, the court said that a plaintiff seeking royalty damages under the Maryland trade secrets statute must show the defendant put the trade secrets to commercial use. Finding that AirFacts failed to prove Amezaga put the flowcharts to commercial use, the court declined to award damages.

6

AirFacts timely appealed the district court's adverse rulings.[3]  We address each in turn.

## II.

"We review a judgment following a bench trial under a mixed standard of review." *Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005).  We review factual findings for clear error and legal conclusions de novo.  *Id.*

## III.

As before, we'll begin with AirFacts's breach-of-contract claims, applying Maryland law per the employment agreement's choice-of-law provision.

## A.

AirFacts first challenges the district court's decision to award only nominal damages for the breach claims on which the company prevailed on the merits.  The court found that the flowcharts, home commission table, and straight sales processing diagram all contained confidential information.[4]  So Amezaga breached paragraph 2.2 of the employment agreement by disclosing the flowcharts to Fareportal without AirFacts's permission.  And

---

[3] One exception.  AirFacts didn't appeal the district court's ruling that the pseudocode wasn't "confidential information."  That decision stands.

[4] As the district court correctly recognized, our holding in *AirFacts I* that the flowcharts are "trade secrets" also means they're "confidential information" under the agreement.  *AirFacts*, 502 F. Supp. 3d at 1038.  The contract defines "confidential information" to include "trade secrets."  J.A. 1421.

he violated paragraph 4.2 by keeping the home commission table and straight sales processing diagram after his employment ended.

The district court then turned to a more complicated question: whether AirFacts could claim any remedy under the agreement's indemnification clause. That clause has a two-pronged materiality requirement. For AirFacts to recover damages, fees, or costs, an employee must *materially breach* a *material provision*. The court agreed with AirFacts that paragraphs 2.2 and 4.2 were material provisions. But it determined that Amezaga only nominally breached them, and so declined to award AirFacts the attorneys' fees and forensic expenses it sought. Finding no error, we affirm.

The district court's materiality determination is a factual finding we review only for clear error. *See Weichert Co. of Md., Inc. v. Faust*, 19 A.3d 393, 399 n.1 (Md. 2011) ("The materiality of a breach of contract is a factual inquiry."); *Schneider v. Saul*, 168 A.2d 375, 380 (Md. 1961) ("[T]he question of the materiality of a breach is usually one of fact."). The employment agreement doesn't define "material," so we look to Maryland law.

A breach is material if it "affects the purpose of the contract in an important or vital way." *Sachs v. Regal Sav. Bank*, 705 A.2d 1, 4 (Md. Ct. Spec. App. 1998). Williston on Contracts offers more guidance, explaining that "[i]n many cases, a material breach of contract is proved by the established amount of the monetary damages flowing from the breach; . . . Conversely, where a breach causes no damages or prejudice to the other party, it may be deemed not to be material." 23 Williston on Contracts, § 63:3 (4th ed. 2021) (cleaned up).

8

We agree that Amezaga breached the employment agreement, but only immaterially because there's no evidence his conduct harmed or prejudiced AirFacts. Indeed, AirFacts hasn't sought compensatory damages. Both the home commission table and straight sales processing diagram were several years old, and the record suggests Amezaga simply forgot he had them. He never accessed either document after leaving AirFacts. And although disclosing the flowcharts to Fareportal "is a somewhat closer question," AirFacts hasn't proven any harm. *AirFacts*, 502 F. Supp. 3d at 1045. Amezaga only sent Fareportal the flowcharts as a work sample, and Fareportal isn't AirFacts's competitor. There's simply no evidence the disclosure was anything "but a minor, technical, violation of the contract." *Id.*

AirFacts makes two arguments to support its view that Amezaga materially breached the agreement. First, it baldly asserts that Amezaga undermined the agreement's fundamental purpose when he breached paragraphs 2.2 and 4.2, offering only general propositions about the importance of protecting confidential information. All this proves is that paragraphs 2.2 and 4.2 were material *provisions*. But by limiting the company's ability to recover damages, attorneys' fees, and litigation costs to *material* breaches of the agreement, the indemnification clause expressly contemplates the potential for *immaterial* breaches of *material* provisions. So we can't say Amezaga materially violated the agreement simply because he breached material provisions, lest we render the material-breach requirement superfluous. *Cf. Owens-Illinois, Inc. v. Cook*, 872 A.2d 969, 985–86 (Md. 2005) (explaining that Maryland courts construe contracts to "giv[e] effect to every clause and phrase, so as not to omit an important part of the agreement").

9

Second, AirFacts argues it *has* suffered harm from Amezaga's breach. But it claims no actual damages. The only injuries the company alleges are the legal fees and forensic costs incurred in this litigation. This argument is circular. It can't be that to recover fees and costs, the breach must be material, and that the breach is material because AirFacts incurred fees and costs. If that were enough, AirFacts alone could transform any immaterial breach into a material one simply by resorting to litigation.

In short, because AirFacts has failed to prove it suffered any harm from Amezaga's contract breaches, the district court didn't clearly err by awarding only nominal damages on these claims.[5]

## B.

AirFacts next contests the district court's rulings that Amezaga didn't violate paragraph 4.2 of the employment agreement, either by accessing and downloading the

---

[5] We aren't swayed by the cases AirFacts cites. *See Glynn v. Impact Sci. & Tech., Inc.*, 807 F. Supp. 2d 391 (D. Md. 2011); *21st Century Sys., Inc. v. Perot Sys. Gov't Servs., Inc.*, 726 S.E.2d 236 (Va. 2012). In both cases, the companies recovered forensic costs as damages for claims that former employees retained confidential documents. But neither case involved an indemnification clause like the one here. The agreement in *Glynn* seemingly authorized the company to recover damages stemming from *any* breach, not just *material* breaches. *See* 807 F. Supp. 2d at 431. And in *21st Century Systems*, the company also recovered substantial compensatory damages. 726 S.E.2d at 239–40.

Nor can AirFacts recover attorneys' fees and forensic expenses as "damages flowing from the breach" despite the indemnification clause. Appellant's Br. at 29. The indemnification clause is the exclusive means to recover under the agreement. Indeed, without that clause, AirFacts would have been unable to recover fees and costs as a matter of law. *See Harry's Thrifty Tavern, Inc. v. Pitarra,* 166 A.2d 908, 912 (Md. 1961) ("[I]t is the general rule that costs and expense of litigation, other than the usual and ordinary court costs, are not recoverable in an action for damages" absent "special circumstances").

10

flowcharts or by retaining the proration documents. We agree with the district court that nothing Amezaga did with the flowcharts breached paragraph 4.2. We part ways, however, over the proration documents.

1.

AirFacts contends that Amezaga violated paragraph 4.2 of the employment agreement when he accessed the flowcharts in Lucidchart. The district court disagreed because that provision only addresses an employee's obligation to return documents containing confidential information "*[u]pon termination* of his engagement with AirFacts." J.A. 1422 (emphasis added). And Amezaga didn't access the flowcharts until after he'd left the company. AirFacts counters that paragraph 4.2 required Amezaga to "return" his Lucidchart login credentials upon his resignation, so when he used the confidential information is irrelevant.

We reject this claim. Even if we assume that Amezaga's Lucidchart login credentials were "confidential information," there's no evidence Amezaga took any document containing that information with him. Paragraph 4.2 only covers "equipment, computer software, drawings, manuals, letters, notes, notebooks, reports, and all other material and records." J.A. 1422. It doesn't reach information a departing employee has in his head (nor could it). Without evidence that Amezaga kept a *record* containing his Lucidchart login credentials, AirFacts can't prove he violated paragraph 4.2.

2.

In its final contract claim, AirFacts argues the district court erred by holding Amezaga didn't breach paragraph 4.2 of the employment agreement when, on his last day

11

with the company, he sent the proration documents to his personal email. We agree with AirFacts.

The district court began by correctly recognizing that the proration documents contained confidential information under the agreement. Still, it found Amezaga didn't violate paragraph 4.2 of the agreement because he "possessed implicit authority to keep these materials." *AirFacts*, 502 F. Supp. 3d at 1037. But nothing in the employment agreement admits an exception to paragraph 4.2's clear requirement that an employee return all documents containing confidential information. Nor does the district court cite any cases supporting an "implicit authority" exception to an agreement's clear terms.

And besides, even under clear-error review, we don't agree that Amezaga had "implicit authority" to keep the proration documents. The district court relied on two factual findings to reach this conclusion. First, "[a]s the creator or co-creator of the documents, [Amezaga] was clearly authorized to access them," and "other employees also used personal email accounts for AirFacts business or worked on home computers." *Id*. AirFacts doesn't dispute this characterization of Amezaga's authority—while he worked for the company. But there's nothing in the employment agreement suggesting Amezaga had a right to retain confidential information he created. In fact, it says the opposite. *See* J.A. 1421 ("The employee agrees that any participation by the employee in the design, discovery, conception, production, perfection, development, or improvement of any invention by the employee is work done for hire for the sole and exclusive benefit of

12

AirFacts and employee hereby assigns to AirFacts all of its rights, title, and interest in and to any and all inventions.").[6]

Second, the court recounted Amezaga's testimony that two superiors asked him to be available for questions about his work after he left AirFacts. Amezaga said he only retained the proration documents to reference if he received such a call. The district court found this testimony credible, and we don't disturb that finding. But it's of no moment because no one at AirFacts asked Amezaga to keep confidential information on his personal computer. [7]

For these reasons, we reverse the district court's ruling that Amezaga didn't breach paragraph 4.2 of the employment agreement by retaining the proration documents after he left AirFacts. But our opinion goes no further. We leave it to the district court to determine

---

[6] We reach the same conclusion even if we read the district court's "implicit authority" ruling as a factual finding that the parties implicitly modified the agreement to allow Amezaga to retain the proration documents. *See Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc.*, 885 A.2d 381, 390 (Md. Ct. Spec. App. 2005) (noting that whether the parties implicitly modified a contract is a question of fact). Again, no one at AirFacts asked Amezaga to keep the proration documents or to do anything else that would have violated paragraph 4.2 without modification. So there's no evidence AirFacts understood it was waiving that provision.

[7] Amezaga contends that our holding in *AirFacts I* that he didn't misappropriate the proration documents is binding law of the case and should compel us to affirm the district court. We disagree. Maryland's trade-secret statute imposes a scienter requirement on misappropriation-by-acquisition claims, requiring that the defendant "know[] or ha[ve] reason to know that the trade secret was acquired by improper means." Md. Code Com. Law § 11-1201(c)(1). So Amezaga could have violated paragraph 4.2 by retaining the documents while still not knowing or having a reason to know that he initially acquired them through "improper means." The findings are not mutually exclusive.

13

on remand whether this breach was material and, if so, what (if anything) AirFacts is owed under the agreement's indemnification clause.[8]

IV.

A.

We now turn to AirFacts's claim that it's owed reasonable royalty damages under the Maryland Uniform Trade Secrets Act. In *AirFacts I*, we held that the flowcharts are "trade secrets" under the Act. On remand, the district court found that by disclosing the flowcharts to Fareportal, Amezaga misappropriated those trade secrets.

As for damages, AirFacts conceded it couldn't prove Amezaga caused any "specific injury" by disclosing the flowcharts. J.A. 1243. So it only sought reasonable royalty damages. To obtain this relief, the district court said AirFacts needed to show that Amezaga put the flowcharts to "commercial use." But the way Amezaga used the flowcharts—as a work sample for his job application—was personal, not commercial. For that reason, the court declined to award damages.

Because we conclude "commercial use" is not a threshold requirement to obtaining reasonable royalty damages under Maryland law, we vacate the district court's ruling and remand.

---

[8] On this claim, AirFacts alleges actual damages beyond costs and fees. The company alleges that Alaska Airlines "required AirFacts, as a condition to sale, to redevelop and modify the Proration software to overcome the data breach." Appellant's Br. at 43. On remand, the district court should consider whether the record supports this claim, and if so, whether redevelopment damages are justified under the agreement.

14

B.

Case law addressing royalty damages for misappropriating trade secrets is sparse. The leading case is *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974). There, the Fifth Circuit said that when "the secret has not been destroyed" and "the plaintiff is unable to prove specific injury," courts can calculate reasonable royalty damages by "measur[ing] the value of the secret to the defendant." *Id.* at 536. Specifically,

> [b]ecause the primary concern in most cases is to measure the value to the defendant of what he actually obtained from the plaintiff, the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place.

*Id.* at 539.

The *University Computing* court added that, for a plaintiff to recover royalty damages, "[t]he defendant must have actually put the trade secret to some commercial use." *Id.* The district court relied on this passage from *University Computing* to impose "commercial use" as a "threshold requirement for obtaining reasonable royalty damages." *AirFacts*, 502 F. Supp. 3d at 1042 (quoting *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-cv-545, 2018 WL 2172502, at *8 (E.D. Va. May 10, 2018)).

But *University Computing* only considered a common law claim for misappropriating a trade secret. It didn't interpret a statute, as we do here. And the Maryland Uniform Trade Secrets Act authorizes reasonable royalty damages "[i]n lieu of damages measured by any other methods . . . for a misappropriator's unauthorized *disclosure or use* of a trade secret." Md. Code Com. Law § 11-1203(c) (emphasis added). Because the Act expressly permits royalty damages for mere disclosure, we can't condition

15

such awards on a defendant putting a trade secret to commercial use. *Cf. Moore v. RealPage Util. Mgmt., Inc.*, 264 A.3d 700, 706 (Md. 2021) (statutory interpretation begins with "looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory" (cleaned up)).

The Tenth Circuit reached the same conclusion in *StorageCraft Technology Corp. v. Kirby*, 744 F.3d 1183 (10th Cir. 2014). There, the court also considered whether "a trade secret plaintiff [could] seek and obtain a 'reasonable royalty' measure of damages . . . without proving the misappropriating defendant made commercial use of the secret." *Id.* at 1185. Like the Maryland Act, "Utah's trade secret statute . . . expressly allows a reasonable royalty measure of damages when the misappropriator *uses or discloses* the trade secret." *Id.* And as here, no one in *StorageCraft* disputed the defendant disclosed a trade secret to another company. *Id.*

*StorageCraft* held that a plaintiff seeking reasonable royalty damages under the statute wasn't required to prove the defendant put a trade secret to commercial use. It explained that "nothing in the state's trade secret statute categorically restricts the availability of 'reasonable royalty' damages to cases in which the misappropriator *used* a trade secret commercially rather than *disclosed* it to others." *Id.* at 1186. And though such damages might not be "the most sensible remedy" in every case, it was "enough for [the] court to recognize and respect Utah's policy choice to permit 'reasonable royalty' awards as a 'general option' in 'disclosure' cases." *Id.* at 1187. So too here.

16

But our holding is limited. We reject only the district court's dispositive ruling that AirFacts was *ineligible* for reasonable royalty damages because it failed to prove Amezaga put the flowcharts to commercial use. That's not to say AirFacts is entitled to royalty damages or that the amount it requests, $440,067, is reasonable. Nor do we pass judgment on the district court's view that "the evidence undermines [AirFacts's expert's] reasonable royalty calculation." *AirFacts*, 502 F. Supp. 3d at 1044. That will all be for the district court to decide on remand.

There's no one-size-fits-all approach to calculating reasonable royalty damages. "[E]very case requires a flexible and imaginative approach." *University Computing*, 504 F.2d at 538. And in this respect, *University Computing* is instructive. On remand, the district court should determine "what a fair licensing price [for the flowcharts] would have been." *Id.* at 539. In doing so, it may consider various factors, including:

> the resulting and foreseeable changes in the parties' competitive posture; th[e] prices past purchasers or licensees may have paid; the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and finally whatever other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes.

*Id.* at 539.

Despite our ruling that putting a trade secret to commercial use is not a threshold requirement to obtaining royalty damages under the Maryland Uniform Trade Secrets Act, the district court may factor how Amezaga used the flowcharts into its analysis on remand. Beyond that, we rely on the court to determine which other factors are relevant here,

17

consider the parties' evidence, and decide what (if anything) AirFacts deserves in reasonable royalty damages.

V.

For these reasons, the district court's judgment is

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED.*